12-1336-ag
Indradjaja v. Holder

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term, 2013

(Argued: September 13, 2013                    Decided: December 9, 2013)

Docket No. 12-1336-ag

————————————

ELLYA INDRADJAJA,

*Petitioner*,

—v.—

ERIC H. HOLDER, JR., UNITED STATES ATTORNEY GENERAL,

*Respondent*.

————————————

B e f o r e :

KATZMANN, *Chief Judge*,  JACOBS, and CARNEY, *Circuit Judges*.

————————————

Ellya Indradjaja petitions for review of a March 9, 2012 order of the Board

of Immigration Appeals ("BIA") denying her motion to reopen her deportation

proceedings and her request for reconsideration of Immigration Judge ("IJ")

Barbara Nelson's June 19, 2009 oral decision denying Indradjaja's asylum

application. The BIA denied Indradjaja's motion to reopen because she had not

submitted an affidavit in support of the new evidence she proffered, and because

she had not submitted copies of the sources on which her expert relied, it refused

to consider the expert report supporting her motion. By attaching consequences

to these new requirements in Indradjaja's case without giving her notice or the

opportunity to respond, the BIA acted arbitrarily and capriciously. Accordingly,

for the reasons stated below, the petition for review is GRANTED, the BIA's

decision is VACATED, and we REMAND for further proceedings consistent with

this opinion.

_____

> THEODORE N. COX, Law Office of Theodore N. Cox, New York, N.Y., *for Petitioner*.
>
> SABATINO F. LEO, Office of Immigration Litigation (Rebekah Nahas and Paul Fiorino, Office of Immigration Litigation, and Stuart F. Delery, Civil Division, *on the brief*), Washington, D.C., *for Respondent*.

_____

KATZMANN, *Chief Judge*:

This case requires us to consider whether the BIA abused its discretion by denying Ellya Indradjaja's ("Indradjaja" or "petitioner") motion to reopen proceedings in her immigration case. The BIA rejected her evidentiary submissions because she had not submitted a sworn statement in support of her motion and because her expert witness had not provided copies of the sources on which he relied. For the reasons set forth below, we conclude that the BIA acted arbitrarily and capriciously in attaching consequences to these previously unarticulated requirements in Indradjaja's case. Accordingly, we grant Indradjaja's petition for review, vacate the BIA's decision, and remand for further proceedings consistent with this opinion.

## BACKGROUND

A. Fact Overview

Ellya Indradjaja is a citizen and native of Indonesia. She is a devout Chinese Christian who spent many years in both Indonesia and abroad furthering her religious education.[1] Growing up in Indonesia, she attended the

---

[1] The following facts are taken from Indradjaja's I-589 Application for Asylum, the I-86 Notice to Appear (charging document), and testimony at her hearing before the immigration court. The IJ found Indradjaja to be credible, and the BIA did not reject this finding.

Christus Romani Church, and, after completing college in 1991, she spent two years ministering in Russia and Australia.  In the years that followed, she spent time in Indonesia and abroad in pursuit of her education and her faith.  Of note, she earned a Certificate in Biblical and Cross-Cultural Studies at the Whole Nation Christian College in England, earned a Master of Arts (Missions) at the Singapore Bible College in Singapore, and did missionary work in Singapore and China.

During that time, however, Indradjaja's pursuit of her faith was troubled, in particular when she ministered to Muslims in Indonesia.  After she co-founded a Christian ministry in the year 2000, she was the target of significant "pressures and intimidations because of this [ministry]."  App'x 284.  For instance, in March, 2002, a Muslim family asked Indradjaja and the ministry's other co-founder to pray and bless the family's house.  While the women were praying, other Muslims in the community threw rocks at the house.  Indradjaja did not call the police because, based on her prior experiences, she did not believe that the police would help her.  She also experienced intimidation, including threats, which at times forced her to cut short worship services.  Because of her personal experiences and the violent attacks on Christian ministries throughout Indonesia, she feared for her safety.

4

In March 2007, Indradjaja came to the United States to visit a friend, who was sick and struggling with her faith, and was lawfully admitted to the United States as a non-immigrant visitor on a B-2 visa. She saw that her Christian friends were not afraid to proselytize in the United States and that she could do so without fear of the harassment and threats that she experienced when ministering in Indonesia. In order to avoid returning to that situation, Indradjaja filed an application for asylum on February 15, 2008.

B.    Asylum Proceedings before the Immigration Court

In response to Indradjaja's application for asylum, the Department of Homeland Security ("DHS") initiated deportation proceedings against her, charging her as removable under 8 U.S.C. § 1227(a)(1)(B) because she had "remained in the United States for a time longer than permitted." App'x 871. She appeared, as instructed, before the IJ, acknowledged that she had overstayed her visa, and applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), on the basis that she feared persecution on the basis of her religion and ethnicity.

In her hearing before the IJ, Indradjaja testified about the threats and harassment she had experienced as a result of being identifiable as an ethnic

5

Chinese and a practicing Christian, as well as the attacks upon Christian churches and worshipers throughout Indonesia. She explained that she was scared to practice her faith and unable to look to the police for protection because, when she had gone to the police in the past, they would not help her. As further support, she submitted over one-hundred articles demonstrating that, during the period between 1998 and 2009, extremist groups forcibly closed and attacked numerous Christian churches and intimidated and used violence against Christians. The IJ found Indradjaja consistent and credible and "sympathize[d] with the respondent's desire to be able to practice her religion . . . freely," but found that she had not "establish[ed] [past] persecution within the meaning of the Immigration Act as opposed to discrimination." App'x 230–32. The IJ also found that the attacks against Christian churches were episodic and not systemic and that, therefore, Indradjaja had not established a well-founded fear of future persecution.

Indradjaja timely appealed the IJ's decision to the BIA. In June of 2011, the BIA affirmed, stating that "the events [Indradjaja] described appear to have constituted harassment and discrimination" but "the cumulative effect of these events [did not] rise[] to the level of persecution." *Id.* at 159. The BIA agreed

6

with the IJ that Indradjaja "ha[d] not demonstrated a reasonable possibility that she would be singled out individually for persecution upon her return to Indonesia" and that "[s]he also ha[d] not established a systematic, pervasive or organized pattern or practice of persecution of ethnic Chinese Christians in Indonesia based upon this record." *Id.* at 159–60. Indradjaja did not seek review of the BIA's decision.

C.      Motion to Reopen

In August of 2011, Indradjaja timely filed a motion to reopen her removal proceedings in order to provide "new and previously unavailable evidence" of "dramatically increased levels of violence and persecution against the Chinese Christians in Indonesia." App'x 10. The new evidence included an affidavit from an expert witness and a number of articles reporting on the increased threat to Chinese Christians in Indonesia.

Indradjaja's motion relied heavily on an affidavit from Dr. Jeffrey A. Winters, a professor and expert on human rights in Indonesia who has served as an expert on Indonesian affairs in governmental and court proceedings. As his affidavit submitted in Indradjaja's case explains, his opinion "rel[ied] upon [his] comprehensive general knowledge of the politics and society of Indonesia, [his]

review of political science materials, human rights reports, [and] media reports both in English and Indonesian relating to recent events in Indonesia, as well as information provided to [him] about Ms. Indradjaja by her attorney," along with "scores of research visits to Indonesia" involving "intensive interviews with sources across the political and social spectrum." *Id.* at 39–41. Based on this information, he opined that: "[c]onditions for ethnic Chinese Indonesians remain threatening because the government does not provide protection and denies involvement in the 1998 riots," *id.* at 41; "[e]conomic and political conditions in Indonesia are unstable, putting ethnic Chinese persons and religious minorities at increasing risk of persecution," *id.* at 44; and "[r]adical Islamic elements in Indonesia are gaining power and influence," *id.* at 45. He further explained that "[h]ardline Islamists violently attack the minority Ahmadiyah [Muslim] section," *id.* at 48, "[there has been a] sharp increase in hardline Islamic threats against religious minorities since 2009," *id.* at 52; and noted that "[a] major scholarly study in 2009 shows evidence of growing Islamic fundamentalism and intolerance of minorities in Indonesia," *id.* at 46. Winters concluded that "Ms. Indradjaja is in danger of persecution on account of her Chinese ethnicity," *id.* at 42, and that she "faces a clear probability of future persecution . . . [because n]o

matter where she tried to relocate in Indonesia, there is no place in the country where her ethnic Chinese ancestry could be hidden," *id*. at 60.  In support of this analysis, Dr. Winters provided a two-page list of the sources cited in his affidavit, along with the addresses for websites where some of those sources could be found.  However, he did not include copies of the sources.

In further support of her motion, Indradjaja submitted numerous reports and articles as evidence of the increased threat to Chinese Christians in Indonesia.  These included: the *International Religious Freedom Report 2010* for Indonesia issued by the U.S. Department of State's Bureau of Democracy, Human Rights, and Labor; a report by the SETARA Institute titled *Where is Our Place of Worship?: A Thematic Review of the Violation of the Freedom of Religion / Beliefs Regarding Places of Worship and the Right to Worship, January–July 2010*; and several shorter documents and articles relating to religious intolerance of Christians in Indonesia.  The State Department report, for example, observes that, "[t]here were a number of reports of societal abuses or discrimination based on religious affiliation, belief, or practice," "[s]ome hard-line Muslim groups used violence and intimidation to close at least 28 churches," and "[o]nly a few perpetrators of these and past abuses have been prosecuted."   App'x 84.  It also reports that, as a

9

general matter, the Indonesian government "failed to prevent abuse and discrimination against religious groups by other private actors and at times failed to punish perpetrators of violence." *Id*. The SETARA Institution report explicitly finds that violence against Christians was on the rise in Indonesia, stating that "[s]ince entering the year 2010, attacks towards places of worship have escalated, especially towards the Christians compared to the year before." *Id*. at 98.[2] The other articles and reports contain similar descriptions of attacks, mob intimidation, arson, and other acts of hostility "brutally target[ing]" Christian churches and worshipers in Indonesia, reportedly "by Muslim fundamentalists or local authorities." *Id.* at 137–138; *see generally id*. at 69–82, 126–55.

---

[2] The report goes on to state:

> Since entering the year 2010, attacks towards places of worship have escalated, especially towards the Christians compared to the year before. In 2008, there were 17 acts of violation; in 2009, there were 18 acts of violation that were aimed at the Christians in several forms. And in 2010, from January–July, . . . there were 28 incidents of violation towards freedom of religion / beliefs.

*Id*. at 98.

D.    BIA Decision

On March 9, 2012, a single member of the BIA denied Indradjaja's motion

to reopen, providing two independent bases for its decision.

First, the BIA rejected Indradjaja's submission in toto "because no affidavit

or sworn statement by the respondent ha[d] been submitted." App'x 3.  The BIA

did not cite to an applicable rule or regulation, but explained:

> In this motion, many claims are made about worsening
> conditions in Indonesia since the respondent's last
> hearing allegedly relevant to, and affecting, her current
> eligibility for asylum, withholding of removal, and CAT
> protection.  However, no affidavit or sworn statement
> by the respondent has been submitted.  Thus, we cannot
> be sure who is advancing the claims set forth in this
> motion.  To the extent they are being made by counsel, it
> is well settled that statements by counsel do not
> constitute evidence.  As such, the relevance of the
> submitted material concerning recent country
> conditions since the respondent's last hearing has not
> been shown.

*Id*. (citations omitted).  Thus, having rejected Indradjaja's evidentiary submission

documenting the worsening conditions in Indonesia, the BIA found that she had

not carried her burden of showing changed country conditions and denied her

request to reopen proceedings.  *Id*.

11

As an alternate basis for denying Indradjaja's motion, the BIA held that "[e]ven if this were not the case, [it] would still deny this reopening request" because the evidence submitted would not have changed the disposition of Indradjaja's motion. *Id*. The BIA came to that conclusion based on its analysis of the Winters affidavit and the other reports and articles submitted by Indradjaja.

In doing so, the BIA gave the Winters affidavit "little, if any, weight," reasoning that:

> [i]n requesting reopening, heavy reliance is placed on the 26-page affidavit by Dr. Jeffrey A. Winters, who discusses conditions in Indonesia before and after the respondent's last hearing, and cites multiple articles and reports to support his statements and conclusions. However, the primary source material cited and discussed by Dr. Winters has not been furnished with the instant motion. Thus, we are unable to independently assess his statements and conclusions, and their relevance to the respondent's request for reopening.

*Id*. (citation omitted).

With respect to the reports and articles submitted by Indradjaja, the BIA stated:

> Although other articles are tendered reporting on the recent and continuing harassment and discrimination of, and violence directed at, Christians (including

12

Church burnings), evidence of similar types of incidents was introduced by the respondent at her removal hearing. The newly-submitted material does not establish significantly worsened conditions in Indonesia pertinent to the respondent's previously advanced persecution and torture claims, so as to warrant its further consideration in reopened proceedings.

*Id.* at 4 (footnote and citations omitted). In a footnote, the BIA observed that "[i]ncluded in this material are articles reporting on the harassment, discrimination, and violence directed at Ahmadiyya Muslims, including attacks that resulted in deaths." *Id.* at 4 n.1. The BIA stated that "[i]nasmuch as the respondent's persecution and torture claims stem from her fear of mistreatment because she is ethnic Chinese and Christian (*not* because she is Ahmadiyya Muslim), the relevance of these particular articles has not been demonstrated." *Id.*

Finally, the BIA addressed Indradjaja's claim that the IJ had erred by concluding that she did not suffer from past persecution. The BIA observed that she had already appealed that decision, and "[t]o the extent she [was] seeking reconsideration of [the BIA's] June 10, 2011, decision dismissing her appeal of the Immigration Judge's decision, her motion to reconsider [was] untimely." *Id.* at 4. Furthermore, to the extent that Indradjaja "present[ed] new arguments

13

challenging the Immigration Judge's decision, . . . a motion to reconsider based on a legal argument that could have been raised earlier in the proceedings, but was not, will be denied." *Id.*

This petition for review followed.

## DISCUSSION

On appeal, Indradjaja primarily argues that the BIA abused its discretion by (1) denying her motion to reopen because she had not provided an affidavit or sworn statement and (2) affording Dr. Winters' expert witness affidavit "little, if any, weight" because he did not submit copies of the materials on which he relied. *Id*. at 3. As we explain below, we agree. Since we find that the BIA acted arbitrarily and capriciously in failing to consider the relevant evidence, we do not consider Indradjaja's remaining challenges to the BIA's decision.

A.   Applicable Law

An asylum applicant may move to reopen proceedings "based on changed circumstances arising in the country of nationality." 8 C.F.R. § 1003.2(c)(3)(ii). "A motion to reopen proceedings [must] state the new facts that will be proven at a hearing to be held if the motion is granted and [must] be supported by affidavits or other evidentiary material." 8 C.F.R. § 1003.2(c)(1). The BIA will not

14

grant such a motion "unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." *Id.*

"We review the decision to deny a motion to reopen removal proceedings for abuse of discretion." *Qin Wen Zheng v. Gonzales*, 500 F.3d 143, 146 (2d Cir. 2007) (internal quotation marks omitted). "An abuse of discretion may be found in those circumstances where the Board's decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements; that is to say, where the Board has acted in an arbitrary or capricious manner." *Ke Zhen Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 93 (2d Cir. 2001) (citations omitted).

B.    The BIA's Errors

We first address Indradjaja's contention that the BIA abused its discretion by rejecting her evidentiary submission because it was not accompanied by a sworn statement from her. She argues that the BIA misinterpreted the law governing motions to reopen because no such requirement exists. As explained below, we agree.

15

The BIA did not cite any rule or authority that requires motions to reopen to be accompanied by a sworn statement from the immigrant. Instead, the BIA concluded that, because "no affidavit or sworn statement by [Indradjaja was] submitted[,] . . . the relevance of the submitted material concerning recent country conditions since the respondent's hearing ha[d] not been shown." App'x 3. It explained that, without a sworn statement, it would not consider the evidence because it "c[ould not] be sure who is advancing the claims." *Id*. In its view, this deficiency was not cured by the brief Indradjaja's attorney submitted along with the materials because "statements by counsel do not constitute evidence." *Id*.

Defending the BIA's decision, the government argues that the BIA correctly denied Indradjaja's motion because the relevant regulation requires that Indradjaja submit an affidavit "explaining how the newly proffered evidence relates to her." Brief for the Government 14. But the regulation requires only that "[a] motion to reopen . . . be supported by affidavits *or other evidentiary material*." 8 C.F.R. § 1003.2(c)(1) (emphasis added). It does not mandate that *any* affidavit be submitted, let alone require one specifically from the petitioner.

16

The government also maintains that the BIA did not abuse its discretion because, due to her failure to submit an affidavit, it was not clear how the evidence regarding objective country conditions was relevant to her particular case. But this argument fails because the relevance of the submitted materials is obvious within the context of this case. Indradjaja submitted an expert affidavit that described both the country conditions *and* their relevance to her claims. Not only does this affidavit satisfy the terms of the regulation, Indradjaja's decision to submit Dr. Winters' affidavit rather than her own sworn statement is also logical since Indradjaja, who had not been to Indonesia during the period in question, would have had no personal knowledge of changes that had occurred in her absence.

Additionally, a sworn statement is not necessary to understand the relevance of the articles that Indradjaja submitted describing conditions for Chinese Christians in Indonesia generally. Although the articles do not refer to Indradjaja specifically, the BIA must consider them in the context of the evidence already submitted by Indradjaja at her prior hearing. *See Ke Zhen Zhao*, 265 F.3d at 97 ("[W]hen faced with a motion to reopen, the Board has an obligation to consider the record as a whole."). The record in this case leaves no room for

doubt about the significance of Indradjaja's evidentiary submission: she testified at her hearing that she is an ethnic Chinese Christian who frequently engaged in proselytizing while living in Indonesia. Given this testimony, it is clear that Indradjaja's submission showing increased violence against Chinese Christians provided an additional reason that she feared persecution in the future. Moreover, a key reason that the IJ denied Indradjaja relief in her original hearing was the IJ's finding that Indradjaja had not demonstrated that attacks on Christians were part of a pattern or practice. Thus, the expert affidavit, articles, and reports documenting increased attacks against Chinese Christians in Indonesia are plainly relevant to Indradjaja's pattern and practice claim and thus to her motion to reopen. Her decision not to submit an affidavit on her own behalf did nothing to undermine that. Accordingly, we find that the BIA abused its discretion by rejecting her evidentiary submission simply because it was not accompanied by a sworn statement from Indradjaja.

Second, we turn to the BIA's alternative holding: that it would have denied Indradjaja's motion in any case because the evidence submitted would not have changed the outcome of her case. This decision, however, was not informed by perhaps the most critical piece of evidence presented by Indradjaja

18

since the BIA discounted, almost entirely, Dr. Winters' affidavit. In the BIA's analysis, the Winters affidavit was "given little, if any, weight" because "the primary source material cited and discussed by Dr. Winters [was] not . . . furnished with the . . . motion" and therefore the BIA was "unable to independently assess his statements and conclusions, and their relevance to the respondent's request for reopening." App'x 3. Indradjaja argues that the BIA abused its discretion in refusing to consider the Winters affidavit and, again, we agree.

Indeed, the government has been unable to identify a single case in which the BIA declined to consider (or devalued) an expert affidavit simply because the expert did not provide copies of the primary sources on which he or she relied. Nor does the government point to a regulation, rule, or any other form of notice that would have apprised litigants that experts must submit such documentation. Furthermore, the BIA's treatment of Winters' affidavit is inconsistent with the way that expert testimony is generally treated. *See* Fed. R. Evid. 703 (permitting an expert opinion to be based on facts or data that experts in the field would "reasonably rely on . . . in forming an opinion on the subject" without regard to the admissibility of the underlying material and without requiring that the

material be submitted); *Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994) ("An affidavit stating the facts upon which the expert's opinion is based satisfies rule 56(e) even if the data supporting the facts is not attached.").

Nor can we approve of the way that the BIA imposed such a rule on the petitioner. We are sympathetic to the government's argument that providing copies of sources on which experts rely would aid the BIA in efficiently resolving cases. However, the BIA could have simply requested those sources from the expert or the litigant, as judges often do. We have long required IJs to request additional information if necessary to ensure an adequate understanding of the claims, *see Ming Shi Xue v. BIA*, 439 F.3d 111, 122–23 (2d Cir. 2006), in keeping with our view that "it is imperative that [such] claims be adjudicated in a fair and reasoned way." *Yuanling Liu v. U.S. Dep't of Justice*, 455 F.3d 106, 117 (2d Cir. 2006). The BIA may establish a new rule that requires that sources be appended to expert affidavits but, in the absence of such a rule, it was an abuse of discretion to impose such a requirement without notice to the parties or an opportunity to respond. It follows that the BIA's improper discounting of Winters' affidavit undermines its rationale for denying Indradjaja's motion to reopen, and we

20

therefore remand the case to the BIA for further consideration in light of this opinion.

We note, in passing, that the BIA's analysis of Indradjaja's remaining evidence also raises concerns. After discounting the Winters affidavit, the BIA rejected the additional reports and articles that Indradjaja submitted as insufficient to justify reopening the proceedings. We expect that the BIA, when adjudicating motions to reopen, will "demonstrate that it has considered [the immigrant's] evidence." *Wei Guang Wang v. BIA*, 437 F.3d 270, 275 (2d Cir. 2006). Here, "[g]iven the brevity of the BIA's decision on this point, questions arise as to its sufficiency." *Id.* Those questions are particularly troubling here in light of the BIA's proffered reason for rejecting two of the articles submitted by Indradjaja—that those articles were irrelevant because they discussed Ahmadiyya Muslims when Indradjaja is a Christian. However, the articles in fact addressed discrimination against and mistreatment of *both* Ahmadiyya Muslims *and* Christians. Therefore, the BIA's treatment of those articles suggests that the BIA may not have given those articles the full consideration due to them, which itself may provide cause for remand. *See Poradisova v. Gonzales*, 420 F.3d 70, 81 (2d Cir. 2005) ("IJs and the BIA have a duty to explicitly consider any country conditions

21

evidence submitted by an applicant that materially bears on his claim. A similar, if not greater, duty arises in the context of motions to reopen based on changed country conditions."). Ultimately, we need not reach this issue because the BIA will have the opportunity to consider all of the evidence on remand.[3]

Immigration law is complex and the consequences of deportation are harsh, *Padilla v. Kentucky*, 559 U.S. 356, 360, 369 (2010), particularly in the context of persecution-based claims. We remand this case mindful of the fact that "we must always remember the toll that is paid if and when we err" because "each time we wrongly deny a meritorious asylum application . . . we risk condemning an individual to persecution." *Ming Shi Xue*, 439 F.3d at 114.

---

[3] Indradjaja has also argued on appeal that the BIA erred by finding that she had not suffered past persecution. As discussed above, the BIA treated this argument as a motion to reconsider and denied that motion because it was untimely and failed to raise any legal arguments that could not have been raised in the earlier proceedings. Indradjaja does not challenge the BIA's characterization of her motion to reconsider as untimely and therefore has forfeited any argument that the BIA improperly denied her motion to reconsider. *See United States v. Quiroz*, 22 F.3d 489, 490 (2d Cir. 1994) (per curiam) ("It is well established that an argument not raised on appeal is deemed abandoned." (internal quotation marks omitted)).

## CONCLUSION

For the foregoing reasons, the petition for review is **GRANTED**.

Accordingly, we **VACATE** the BIA's March 9, 2012 decision and **REMAND** to the

BIA for further proceedings consistent with this opinion.