11-4362-ag
Acharya v. Holder

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2013

(Argued: September 11, 2013                    Decided: August 5, 2014)

Docket No. 11-4362-ag

_____

PRAKASH ACHARYA,

*Petitioner*,

v.

ERIC H. HOLDER, JR., United States Attorney General,

*Respondent*.

_____

Before: KATZMANN, *Chief Judge*, JACOBS and POOLER, *Circuit Judges*.

Appeal from a decision of the Board of Immigration Appeals dismissing an

appeal from an oral decision of the Immigration Judge, which denied petitioner

Prakash Acharya's application for asylum, withholding of removal, and for

protection pursuant to the Convention Against Torture. In concluding that

Acharya had not carried his burden to establish his eligibility for asylum the Immigration Judge, incorrectly and often, stated that Acharya had failed to establish that political opinion was "the central reason" for his persecution at the hands of Nepali Maoists, Certified Administrative Record at 68-70, rather than only "at least one central reason" for this persecution, 8 U.S.C. § 1158(b)(1)(B)(i). The Immigration Judge thus committed error in requiring Acharya to meet an incorrect and overly stringent burden of proof. Accordingly, for the reasons stated below, the petition for review is GRANTED, and we REMAND this case for further proceedings consistent with this opinion.

_____

GARY J. YERMAN, Yerman & Associates, LLC, New York, NY, *for Petitioner*.

JULIE S. SALTMAN (Stuart F. Delery, Paul Fiorino, and Jessica R.C. Malloy, *on the brief*), United States Department of Justice, Washington, DC, *for Respondent*.

POOLER, *Circuit Judge*:

We consider in this case the consequences of an Immigration Judge's ("IJ's") application of an incorrect and overly stringent legal standard when evaluating the nexus between an asylum applicant's persecution and a protected

ground that might qualify the applicant as a refugee. In concluding that petitioner Prakash Acharya had not established that he suffered persecution on the grounds of political opinion, the IJ determined that Acharya failed to show that political persecution was "the central reason" for his persecution at the hands of Nepali Maoists. Certified Administrative Record ("CAR") at 68; *see also id.* at 69; *id.* at 70. In so concluding, the IJ incontrovertibly applied an incorrect and overly stringent legal standard in analyzing testimony offered by Acharya, who may satisfy his burden for establishing eligibility for asylum by demonstrating that a statutorily protected ground, such as political opinion, "was or will be at least one central reason for persecuting the applicant," 8 U.S.C. § 1158(b)(1)(B)(i). The IJ thus committed error in his evaluation of Acharya's asylum application. Accordingly, the petition for review is GRANTED, and we REMAND this case for further proceedings consistent with this opinion.

## BACKGROUND

In this case the IJ found Acharya to be credible, and the BIA did not reject this finding. The following facts are thus taken, inter alia, from Acharya's testimony before the IJ, certain written materials, both official and personal to Acharya, which he submitted in conjunction with the hearing before the IJ, and

3

Acharya's I-589 Application for Asylum. *See Indradjaja v. Holder*, 737 F.3d 212, 214 n.1 (2d Cir. 2013).

**I.      Acharya & The Maoists**

Acharya is 34 years old and a citizen and native of Nepal. He is husband to Ritu Acharya (since 2004); father to a minor son, Prerit; brother of two sisters, Januka and Dipa, one older and one younger; and son to Yamuna and Thakur, petitioner's father and a founder of the Nepali Congress political party. For the purposes of this asylum proceeding there are two facts about petitioner's life that are particularly salient. First, following his father and other members of his family, Acharya is a member of the Nepali Congress party. He was, from 1996 to 1999, active in the Student Union of the Nepali Congress, and held a leadership position as an administrative officer of its board. Second, in 1999 he joined the Nepali Police Force. This position precluded him from engaging in political activities on behalf of the party. Both positions, however, brought him into conflict with Nepali Maoists.

At all points relevant to this appeal, Nepal was engaged in a violent internal armed conflict. The record indicates that in 1996, the Maoist United People's Front initiated an insurgency, committing acts of violence against both

4

civilian and government targets. Attempts to broker peace between the Maoists and a succession of governments, intermittently led by the Nepali Congress Party, proved fruitless until Maoists declared a unilateral cease-fire on April 26, 2006. The imposition of the cease-fire did not immediately put an end to incidents of Maoist violence. However, negotiations eventually led to the formation of a Constituent Assembly via election on April 10, 2008, with the responsibility both to serve as a Parliament and to draft a new Nepali constitution. In those elections, the Communist Party of Nepal (Maoist) won 229 of 601 available seats, while the Nepali Congress party won 115, making these the two largest political parties in the Asembly.

Acharya grew up in the rural district of Sindhuli, where his family owned land and worked as farmers. He graduated from high school in 1999, and joined the Nepali Police Force on September 5 of that year. He was motivated to do so because he "was a member of Nepal Congress and [he] wanted to do for the country." CAR at 123. Upon joining the Police Force Acharya relocated to another district while his family remained in Sindhuli. His first responsibilities were limited to data entry.

Threats from Maoists directed at Acharya's father on account of the family's political activities began when Acharya was still in school, prior to his decision to join the Police Force. These threats highlighted the political activities of both Acharya, as a member of the Student Union, and his father, as a member of the Nepali Congress. The threats directed at Acharya's father presented his father with two choices—join the Maoists or face death. These threats were also occasionally accompanied by demands for money.

On March 14, 2005, Maoist insurgents went to Acharya's home in Sindhuli, where Acharya's mother, father, and wife were sleeping. They abducted Acharya's wife and father, and took them to the jungle. Apparently making reference both to Acharya and his family, the Maoists stated that the kidnapping was because "you're also in the student union and you're also in the police force and we're also the member[s] of the Nepali Congress." *Id.* at 130. Through the intervention of Nepali Congress members in the village, whose assistance had been sought out and secured by Acharya's mother, Acharya's father and wife were released.

Acharya's family fled from Sindhuli within 45 days of the incident. At the time of Acharya's application for asylum before the IJ, his family was living with

various family members in Kathmandu, and had been doing so virtually the entire time since Maoists forced their flight. The family was constantly changing houses in Kathmandu to avoid the possibility that Maoists would determine their whereabouts.

On January 15, 2006, a dispatch directed to Acharya's father issued from an organization referring to itself, on official stationary, as the District Organization Committee, Sindhuli, of the Nepal Communist Party (Maoist).[1] By this dispatch, the Maoists indicated that Acharya's police work had led to numerous arrests of Maoist party members. As such, the dispatch concluded, the party had decided to "take deadly action and capture your house and land till arresting your son." *Id.* at 254. At the time of Acharya's petition before the IJ, Maoists apparently were still occupying the family's home in Sindhuli.

By May 2006, Acharya had been promoted from his previous rank in the Police Force, Constable, to the rank of Head Constable. In this role, his responsibilities changed. Instead of data entry and computer-related work

---

[1] The record does not indicate how this dispatch made its way to either Acharya or to his father, who had fled Sindhuli by this point. The record does disclose that Acharya's uncle continues to live in Sindhuli, and that he has been responsible for communicating Maoist threats to Acharya and his family since the other members of Acharya's family have fled.

Acharya began going out into villages and collecting data about the identities and activities of Maoists in an undercover capacity.

On May 18, 2006, in the course of one such assignment, he arrived in the district of Ramechhap. He proceeded to a village called Priti, which was twenty-four hours by walking from Sindhuli. On May 21, Maoists in Priti recognized Acharya by his civil uniform and haircut as being in the village in order to gather information on them. Maoists subsequently attacked and detained him. In the course of the attack Acharya sustained serious injuries to his leg, which required four days of hospitalization.

During this detention, but after the physical violence, Acharya was approached by one of his Maoist captors. Before the IJ, Acharya stated his captor accosted him as follows: "Don't you know that we're Maoist terrorists? You have come here to keep the record of our party. You work for the computer section of the police. You are in the democratic party of (indiscernible). And all your family members is in Nepali Congress." *Id.* at 141. Acharya concluded, "I found that she had all information about me." *Id.*

The Maoists subsequently blindfolded and tied up Acharya. He was handed over to a resident of the village, who brought him to a joint police and

army barracks for treatment. He returned to Kathmandu, where he continued working for the police.

In early 2008, Acharya was dispatched to Haiti under the auspices of the United Nations mission there. In the course of living in Haiti he obtained a B-2 non-immigrant visa for the United States. His mission complete in Haiti, he returned to Nepal. At this point he resigned from the Police Force because, in his mind, "[t]he terrorists were looking for me and I did not have the protection and the safety. And I could not join their party and I could not beat the terrorists." *Id.* at 144-45. Acharya stayed in Nepal for between ten and twelve days, at which point he traveled to the United States and entered legally pursuant to the visa he received in Haiti. He arrived on or about September 13, 2008 and was authorized to stay through March 12, 2009. He remained beyond this period of authorization, and on September 11, 2009 applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

**II.    Proceedings Before the IJ**

Acharya appeared before Immigration Judge Michael W. Straus on February 24, 2010. At that proceeding, he petitioned for (i) asylum under Section 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158, (ii)

9

withholding of removal under Section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), and protection under the CAT, 8 C.F.R. § 1208.16(c)(2). After hearing from Acharya, and reviewing various written submissions proffered by Acharya, the IJ issued an oral decision concluding that Acharya was ineligible for relief on the basis of any of the grounds he asserted. *In re Acharya*, A 087 645 737 (Immig. Ct. Hartford Feb. 24, 2010), CAR at 59-72.

The IJ framed the "main issue [as] whether [Acharya] was persecuted . . . on account of a protected ground." CAR at 67. Consistent with Acharya's application at that time,[2] that question turned on whether his persecution "was on account of political opinion or an imputed political opinion." *Id.* In reviewing the evidence, the IJ concluded that Acharya "ha[d] not met his burden of proof to establish that the central reason for his persecution was his political opinion." *Id.* at 68. Rather, to the IJ "it appear[ed] that the Maoists were naturally upset" at the effectiveness of Acharya's police activities, and thus "the actions taken by the

---

[2] On appeal, Acharya now also argues that he is eligible for asylum on the grounds of his membership in a particular social group. The government points out that this theory of relief is raised for the first time on appeal, thereby invoking its affirmative defense that these arguments have not been exhausted. Thus, we do not consider these arguments. *See Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 107 n.1 (2d Cir. 2007).

Maoists . . . were based on his employment as a police officer rather than his political opinion." *Id.* at 68-69. The IJ stated that "there is no evidence that [the Maoists] specifically targeted [Acharya] because of his former affiliation and his family's affiliation with the Congress party." *Id.* at 69.

Turning to the attack on Acharya's family, the IJ again reasoned that Acharya's political opinion was not "the central reason for that abduction . . . . Perhaps it might have greater relationship to his father's political opinion, but there is no evidence that it had to do with [Acharya's] political opinion or imputed political opinion." *Id.* Additionally, in determining whether Acharya had reason to prospectively fear persecution on account of his political opinion if he were to return to Nepal, the IJ concluded that "it appears that the central reason" for such a prospective fear would be due to "the fact that [Acharya] worked as a police officer against the Maoists." *Id.* at 70.

With respect to withholding of removal, the IJ concluded, "Since [Acharya] failed to meet the well-founded fear for asylum, it follows that he fails to meet the clear probability standard for withholding of removal." *Id.*

Finally, turning to the question of whether Acharya had a basis for relief with respect to his claim under the CAT, the IJ determined, "There is absolutely

no evidence that government authorities would torture [Acharya]." *Id.* at 70-71. The IJ apparently concluded that Acharya was unlikely to suffer torture because "there is now a coalition government in power in Nepal" and there was "no evidence" that police officers who fought the Maoists had been tortured. *Id.* at 71.

The order of the IJ denied all bases of relief for which Acharya had applied.

**III.    Proceedings Before the Board of Immigration Appeals**

Acharya timely appealed the decision of the IJ. His brief before the Board of Immigration Appeals (the "BIA") challenged the IJ's decision with respect to Acharya's asylum eligibility, as well as Acharya's eligibility for relief under the CAT. With respect to Acharya's challenge to the IJ's conclusion that he had not been persecuted on the basis of political opinion, the BIA affirmed the IJ's determination, stating that Acharya "ha[d] not shown that one central reason that he was targeted" was his role with the Nepali Congress. *In re Acharya*, No. A 087 645 737 (B.I.A. Sept. 26, 2011), CAR at 4.

With respect to Acharya's claims under the CAT, the BIA "conclude[d] that the facts do not demonstrate that [Acharya] would more likely than not be

tortured in Nepal by or with the acquiescence of a public official or other person acting in an official capacity." *Id.* at 4-5.

This timely appeal followed.

**DISCUSSION**

**I.** **Applicable Law**

**A.** **Standards of Review**

Where, as here, "the BIA does not expressly adopt the IJ's decision, but its brief opinion closely tracks the IJ's reasoning, this Court may consider both the IJ's and the BIA's opinions for the sake of completeness." *Zaman v. Mukasey*, 514 F.3d 233, 237 (2d Cir. 2008) (internal quotation marks omitted). "Legal issues, and the application of law to fact, are reviewed de novo." *Castro v. Holder*, 597 F.3d 93, 99 (2d Cir. 2010). Our review of the factual findings of the agency, however, is considerably circumscribed: "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We have described our standard of review of an IJ's factual findings as "exceedingly narrow." *Wu Biao Chen v. INS*, 344 F.3d 272, 275 (2d Cir. 2003) (internal quotation marks omitted).

**B. Asylum Eligibility**

Section 1158(b)(1)(A) of Title 8 of the United States Code lays out the criteria for establishing eligibility for asylum, and allows in pertinent part the granting of asylum status to an alien if it is determined "that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." We have thus described asylum as "a discretionary form of relief available to certain aliens who qualify as 'refugees' within the meaning of the INA." *Castro*, 597 F.3d at 100 (quoting 8 U.S.C. § 1158(b)(1)(A)). To qualify as a refugee, in turn, an alien must meet certain criteria, including being "outside any country of such person's nationality," and being "unable or unwilling to return to[] . . . that country." 8 U.S.C. § 1101(a)(42)(A). As relevant to our decision here, the inability or unwillingness to return must be "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.*

Congress has also laid out with particularity a number of standards to be employed in determining whether an alien qualifies as a refugee. First, Congress has placed "[t]he burden of proof . . . on the applicant to establish that the applicant is a refugee." *Id.* § 1158(b)(1)(B)(i). Second, "[t]o establish that the

14

applicant is a refugee . . . the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." *Id.* Finally, Department of Justice regulations further clarify the manner in which an asylum applicant may establish eligibility by creating a presumption that the applicant will face future persecution if the applicant establishes the existence of past persecution. 8 C.F.R. § 1208.13(b)(1) ("An applicant who has been found to have established . . . past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim.").

## C. Mixed Motive Asylum Claims

As this case was presented, the IJ confronted a situation in which there were two plausible grounds to conclude that Acharya was being targeted for persecution—his responsibilities as a police officer, which brought him into direct conflict with Nepali Maoists, and his political affiliation with the Nepali Congress, the political beliefs of which differ from those of the Maoists. Persecution "on account of" one of these grounds, namely political opinion, would qualify Acharya as a refugee, and thus he would be eligible for asylum status. 8 U.S.C. § 1101(a)(42)(A). Persecution on account of being a policeman,

15

however, is not generally a basis for refugee status, *see Matter of Fuentes*, 19 I. & N. Dec. 658, 661 (B.I.A. 1988), though there are limits to the application of this principle in this case, which we will address below.

We have classified such cases, where multiple possible bases of persecution exist, as "mixed motive[] asylum claims." *Castro*, 597 F.3d at 104; *see also Aliyev v. Mukasey*, 549 F.3d 111, 116 (2d Cir. 2008); *Vumi v. Gonzales*, 502 F.3d 150, 158 (2d Cir. 2007); *Uwais v. U.S. Attorney Gen.*, 478 F.3d 513, 517 (2d Cir. 2007). While use of this terminology in our cases is of a relatively recent vintage,[3] the relevant legal and logical principles which inform it are not, and have been recognized numerous times in this Court, particularly in the context of cases considering asylum eligibility on account of political opinion.

---

[3] In the context of asylum, the first apparent use of the phrase to describe cases in which multiple motives for persecution might exist, though only one would provide a basis for relief, was the BIA's precedential decision in *In re S-P-*, 21 I. & N. Dec. 486 (B.I.A. 1996). The reference to mixed motive cases is familiar from employment discrimination analysis first laid out by the plurality in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 232 (1989) (plurality opinion) (describing the case as one which lays out relevant burdens for determining liability "when it has been shown that an employment decision resulted from a mixture of legitimate and illegitimate motives"), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, *as recognized in Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116 (2d Cir. 1997).

16

For example, *Osorio v. INS* required us to consider a claim for asylum brought by a Guatemalan trade-unionist. 18 F.3d 1017 (2d Cir. 1994). Applying the Supreme Court's then-recent "interpretation of 'political asylum' as set forth . . . in" *INS v. Elias-Zacarias*, 502 U.S. 478 (1992), we found that the BIA incorrectly limited the definition of political asylum. *Osorio*, 18 F.3d at 1023. The BIA had concluded that "Osorio was *persecuted on account of his economic stands against the government* . . . and, therefore, . . . was not eligible for asylum because the laws of the United States do not provide for economic asylum." *Id.* at 1028 (emphasis in original). We did not reject this "characterization of the dispute." *Id.* Instead, we reasoned that:

> [T]he problem is with the BIA's illogical leap from this characterization to the conclusion that Osorio was not eligible for asylum. The plain meaning of the phrase "persecution on account of the victim's political opinion" does not mean persecution *solely* on account of the victim's political opinion. That is, the conclusion that a cause of persecution is economic does not necessarily imply that there cannot exist other causes of the persecution.

*Id.* (emphasis in original). Finding the record sufficient to support the conclusion that Osorio was targeted for persecution both on the basis of "economic" activities, as well as political opinion, we ruled that the record "compels the view

that Guatemalan authorities persecuted Osorio because he and his union posed a political threat." *Id.* at 1029.

Ours was not the only Circuit to have recognized the conundrum that arose in cases in which multiple bases for persecution existed and, as of 2005, across the Circuits "there [was] . . . no uniform standard for assessing motivation." H.R. Rep. No. 109-72, at 163 (2005) (Conf. Report), *reprinted in* 2005 U.S.C.C.A.N. 240, 288 (surveying various standards for assessing motivation). Among other changes to immigration law, the REAL ID Act of 2005 imposed a single uniform standard for evaluating the nexus between persecution and a protected ground, by requiring that a protected ground serve as "at least one central reason" for persecution. REAL ID Act of 2005 § 101(a)(3), Div. B of Pub. L. No. 109-13, 119 Stat. 231 (codified at 8 U.S.C. § 1158(b)(1)(B)(i)). In adopting this standard, Congress evinced an understanding that this language would explicitly guarantee the continued viability of mixed motive claims: "under this amendment, asylum may be granted where there is more than one motive for mistreatment, as long as at least one central reason for the mistreatment is on account of" a protected ground. H.R. Rep. No. 109-72, at 165, *reprinted in* 2005 U.S.C.C.A.N. at 290. And we have noted that "[o]n its face . . . the language

18

employed makes clear that mixed motives asylum claims continue to be viable, and the BIA has so held." *Castro*, 597 F.3d at 104 (citing *In re J-B-N & S-M-*, 24 I. & N. Dec. 208, 212 (B.I.A. 2007)).

**II.    Application**

**A.    The IJ, in Requiring Petitioner to Prove Political Opinion was "The Central Reason" for his Persecution, Committed Error Requiring Remand**

**1.    Applying the Incorrect Legal Standard in a Mixed Motive Case**

In this case the IJ, by holding Acharya to the requirement of demonstrating that political opinion was "the central," as opposed to "at least one central," ground for persecution, did not make a mere drafting mistake. Rather, he set up an "illogical" rubric for analyzing motivation that presupposed that multiple motives for persecution must be analyzed in competition with one another, rather than in concert. *Osorio*, 18 F.3d at 1028.

This is not the first time we have confronted this sort of error. In *Castro*, we granted a petition for review brought by a Guatemalan police officer who sought asylum on the ground of political persecution.  597 F.3d at 95-96. The officer claimed that he had been targeted for persecution after reporting on official

19

corruption that he had observed within his department. *Id.* at 96-97. Among other reasons for rejecting this claim, the IJ concluded that political opinion had not formed the basis of the officer's persecution, but rather that the officer was targeted because the individuals he had reported as corrupt were instead retaliating for the officer's decision to decline to join these individuals in their illegal activities. *Id.* at 99. In granting the petition for review, we noted that "even if recruitment were *one* reason for Rodas's persecution, that would not be conclusive, for Rodas need show only that his political opinion[] . . . was 'one central reason' for his persecution, not that it was the sole reasons for it." *Id.* at 103 (emphasis in original). Because the agency applied an erroneous standard to Rodas's claim, we granted the petition for review.

Similarly, *Aliyev* required us to review a claim for asylum based on the petitioner's ethnic Uyghur background and political opinion. 549 F.3d at 113. The petitioner alleged that he had been subject to past persecution because the Kazakh government took no action to protect him in the face of private acts of violence, which he claimed were motivated at least in part by his ethnicity. *Id.* at 117-19. The BIA, in rejecting this claim, decided that this violence could not serve as the basis for asylum eligibility because it was part of an extortion scheme,

rather than "motivated by ethnic animosity." *Id.* at 117. Our review, however, revealed that the BIA had ignored statements made by the petitioner's assailants which suggested that the petitioner's ethnic background was "material to the motivation for [the assailant's] treatment of [the petitioner]." *Id.* at 118. We thus concluded that "[t]he BIA's failure to conduct the required mixed-motive analysis and consider evidence supporting [the petitioner]'s claim that [the assailant]'s actions were motivated at least in part by [the petitioner]'s ethnicity constitutes reversible error." *Id.*

By way of a final example, *Uwais* concerned the asylum application of a Tamil Muslim. 478 F.3d at 515. One of the petitioners in the case, Noor Fiyaza Rizvie, lived in a house where four male Tamils were tenants. *Id.* Sri Lankan police, after searching the house and finding weapons and material related to the Tamil Tigers, detained Rizvie for three days, during which time she was interrogated, beaten, and sexually assaulted. *Id.* at 515-16. Although the BIA determined that the arrest and questioning were motivated by the fact that "officers had found weapons on her property," *id.* at 516, we found that undisputed evidence in the record suggested that these actions were taken, at least in part, "on account of imputed political opinion based on her suspected

21

affiliation with the armed Tamil Tiger tenants," *id.* at 517. We likewise rejected as "based on significant errors" the BIA's "perfunctor[y] conclu[sion]" that the officer who sexually assaulted her while she was detained "was *solely* motivated by personal aggression." *Id.* at 518 (emphasis added). These errors thus required us to grant the petition for review and remand the case to the BIA.

Our holdings in *Castro*, *Aliyev*, and *Uwais* compel the result in this case. Here, by recasting his inquiry as one into "the central" as opposed to "at least one central" reason for persecution, the IJ made an illogical leap that vitiated the possibility of a mixed motive claim. "[C]onsidering all of the evidence in this record," the IJ concluded that Acharya was targeted "based on his employment as a police officer *rather than* his political opinion." CAR at 68-69 (emphasis added). Thus, while the IJ considered Acharya's political opinion, he assumed that the existence of another, and in the IJ's opinion, more likely, possible basis of persecution meant that Acharya could not meet the qualifications of a refugee. As we have made clear, however, the possibility of multiple motives for persecution precludes this type of either/or approach to evaluating asylum claims.

This application of an incorrect, overly stringent legal standard, in conjunction with the errors that it produced, which we will review below, require

22

us to grant this petition and remand this case. *See Castro*, 597 F.3d at 107.[4]

## 2. Overlooking Material Factual Evidence or Mischaracterizing the Record

In granting petitions for review in cases in which the agency erred by failing to consider multiple bases for persecution, we have also noted that such legal errors are accompanied by factual misstatements, mischaracterizations of the record, or failure to acknowledge pertinent record evidence. *See, e.g.*, *Aliyev*, 549 F.3d at 119 ("[T]he BIA was not supported by substantial evidence in its finding that Aliyev did not show that the government was unwilling to protect him from private persecution."). We have often, in the case of political asylum, characterized these errors as failures to account for the particular context in

---

[4] A second line of cases might also inform our decision here. We have been frequently called on to interpret what is meant by "questions of law" under 8 U.S.C. § 1252(a)(2)(D). We have held that "where[] . . . a petitioner argues that the agency applied an erroneous legal standard in making a discretionary determination, the petitioner raises a question of law." *Khan v. Gonzales*, 495 F.3d 31, 35 (2d Cir. 2007); *see also Liu v. INS*, 508 F.3d 716, 721 (2d Cir. 2007). We thus, on numerous occasions, have had cause to consider the typology, and likely result, of errors such as the one made by the IJ in this case, and have considered the application of an incorrect, heightened standard to be a legal error. Because we conclude that our mixed motive cases control the result here, we need not discuss in greater detail the relationship between our cases that consider the application of overly stringent standards in the asylum context as a jurisdictional matter, as opposed to the application of the wrong legal standard of the variety engaged in by the IJ in this case.

which political persecution occurs. *See, e.g.*, *Castro*, 597 F.3d at 106 (collecting cases and noting that "political persecution cannot be evaluated in a vacuum" and that "careful consideration of the broader political context is necessary"). Requiring remand in such cases is in keeping with our conclusion that where "facts important" to an ultimate agency conclusion "have been totally overlooked and others have been seriously mischaracterized, we conclude that an error of law has occurred." *Mendez v. Holder*, 566 F.3d 316, 323 (2d Cir. 2009). Such is the case here.

Consider that Acharya testified credibly to three particular incidents that gave insight into the Maoists's motivations for targeting him: his own detention by the Maoists, the detention of his father and his wife by the Maoists, and the dispatch which marked Acharya for arrest and death and, by its terms, entitled the Maoists to seize Acharya's family's home and land pending the execution of this sentence. In his analysis of Acharya's detention, the IJ stated "that there is no evidence that [the Maoists] specifically targeted [Acharya] because of his former affiliation and his family's affiliation with the Congress party." CAR at 69. With respect to the abduction of Acharya's father and wife, the IJ stated that "there is no evidence that it had to do with [Acharya]'s political opinion or imputed

24

political opinion." *Id.* However, in both of the incidences of detention, Maoists explicitly mentioned both Acharya's police activities and his political affiliations. Thus, the Maoists that detained and beat Acharya knew both that he was an officer and that he, like "all [his] family members[,] is in Nepali Congress." *Id.* at 141. And the Maoists told his father and wife that they were being targeted because "you're also in the student union and you're also in the police force and we're also the member[s] of the Nepali Congress." *Id.* at 130. Additionally, the IJ's finding that other police officers were not mistreated by the Maoists may suggest that Acharya was singled out for other reasons, and that one might have been his political affiliations. Given the credible testimony to these events, we are at a loss to understand the IJ's statement that "there is no evidence" that Acharya was targeted for his political beliefs. *See, e.g., Uwais*, 478 F.3d at 518 ("With minimal explanation, the Board perfunctorily concluded that Rizvie had not presented sufficient evidence that the sexual assault was 'motivated . . . by any protected ground.' To the contrary, Rizvie testified that the assault was motivated, at least in part, by . . . the . . . perception that she was affiliated with Tamil Tigers, and . . . her ethnicity."). The very words of those who targeted Acharya and his family

25

for persecution reveal that political belief was at least one (one of only two, in fact) reason for their targeting.

### 3. The Government's Arguments are Unavailing

We now turn to the government's arguments on appeal. The government asserts, "The best and most direct evidence of the Maoists['] intent is their own words." Gov't Br. at 20. We agree with that statement, as far as it goes, as it recognizes the difficulty in gathering evidence of motivation in asylum cases. *See Elias-Zacarias*, 502 U.S. at 483 (refusing to require an asylum applicant "to provide direct proof of his persecutor's motives"); *see also In re S-P-*, 21 I. & N. Dec. 486, 494 (B.I.A. 1996) (noting that, in ascertaining motive, the agency may evaluate "statements or actions by the perpetrators"). However, after making this argument, the government then systematically ignores all of the statements submitted by Acharya which indicated that the Maoists in fact did impute a political opinion to him, as noted above. Even if these statements did not establish that political opinion was the sole reason for Acharya's persecution, that is not something that they were required to do.

This leaves us with the Maoists' letter. It is true that this note, which purports to be a death sentence passed on Acharya, limits the bases of his

26

conviction to his work with the police, as the government points out. However, in a related context, one of our sister circuits has observed that notes from "persecutors cannot be expected to conform to arbitrary evidentiary rules established by" our immigration system. *Aguiler-Cota v. INS*, 914 F.2d 1375, 1380 (9th Cir. 1990). The conclusion that Acharya did not suffer persecution on the basis of his political opinion solely as a result of the contents of this note is not sustainable. The fact that the note, produced by the "judicial branch" of the Maoist insurgency, alluded to police work as one basis for Acharya's sentence in no way forecloses the possibility that he was targeted on the ground of political opinion as well. It would be unreasonable to expect a document of this sort to transparently and comprehensively set forth all of the bases for Acharya's persecution, and we refuse to do so, especially in light of the other credible evidence of the Maoists' political motives, as discussed above.

Finally, in a footnote, the government acknowledges that the IJ "erred in articulating the standard," but argues that "the error was harmless as the Board articulated the proper 'one central reason' standard." Gov't Br. at 20 n.4. We disagree. The BIA's substitution of the proper standard at the intermediate appellate level without considering how the error might have colored the

27

findings of fact cannot plausibly be read to support the conclusion that "the Board has considered the issue," *id. See, e.g.*, *Manzur v. U.S. Dep't of Homeland Sec.*, 494 F.3d 281, 289 (2d Cir. 2007) ("This Court . . . will not hesitate to vacate and remand where the BIA or IJ *analysis* is insufficient to determine whether the correct legal standard was applied." (emphasis added)). When the Board upholds questionable fact-findings, and does so using a different standard, the result may amount to impermissible fact finding by the BIA.

"The agency's own regulations[] . . . prohibit the BIA from engaging in factfinding 'in the course of deciding appeals,' except insofar as it takes 'administrative notice of commonly known facts such as current events or the contents of official documents.'" *Xiao Kui Lin v. Mukasey*, 553 F.3d 217, 221 (2d Cir. 2009) (quoting 8 C.F.R. § 1003.1(d)(3)(iv)). The government has failed to persuade us that remand is not required in this case.

In sum, we conclude that the IJ committed numerous "combined legal and factual errors" in evaluating Acharya's claim that he was persecuted on the basis of his political belief. *Castro*, 597 F.3d at 106. These errors were not corrected on appeal before the BIA. Accordingly, the petition for review is granted.

**B. On Remand, the Agency May Take Into Account the Unique Policing Responsibilities of Petitioner to Determine his Eligibility for Asylum on the Basis of Political Opinion**

Though we are remanding this case to the BIA on the grounds that the IJ committed numerous errors in reaching his conclusions regarding the reasons for Acharya's persecution, we note that we also have concerns regarding the IJ's and BIA's conclusions regarding Acharya's asylum eligibility due to his particular police work. The BIA, for example, relying on *Matter of Fuentes*, 19 I. & N. Dec. at 661, apparently determined that the dangers faced by Acharya were the dangers faced by normal police officers, and that under *Fuentes* "the dangers the police face are no more related to their personal characteristics or political beliefs than are dangers faced by military combatants." CAR at 4 (quoting *Fuentes*, 19 I. & N. Dec. at 661). In distinguishing this case from our decision in *Castro*, which concluded that a policeman who reported on official police corruption could establish eligibility for asylum on the ground of political belief, 597 F.3d at 106, *see also Grava v. INS*, 205 F.3d 1177, 1181-82 (9th Cir. 2000), the BIA reasoned that *Castro* turned on public denunciations made by the applicant against police corruption.

We doubt that *Castro* can be read so narrowly. While it remains true under *Fuentes* that dangers commonly faced by police cannot serve as the basis for an asylum claim, *Castro* focused on the activities and responsibilities unique to the petitioner in assessing the relationship between persecution and a protected ground. *See Castro*, 597 F.3d at 105 ("[Petitioner's] actions unquestionably went beyond those of an ordinary policeman reporting a crime."); *see also Castañeda-Castillo v. Holder*, 638 F.3d 354, 366 (1st Cir. 2011) (collecting cases critical of *Fuentes*, cautioning against an overbroad reading of the case, and finding that officers who come to be associated with a particularized role in a specific incident could qualify for asylum on the basis of membership in a particular social group). The operative inquiry in these cases focused on the specific risk profile of the individual petitioners. The agency here did not consider whether Acharya's work for the police (in the relevant phase) might be seen by the Maoists as Acharya's effort to undermine their plurality position in the national legislature, consistent with his (and his family's) political allegiances. *See Osorio*, 18 F.3d at 1029.

The reasons that make it error to consider political persecution in opposition to persecution on the ground of being a policeman also make it error to fail to give consideration to the political dimension of Acharya's police work

30

itself. Greater nuance in the consideration of Acharya's particular "political context" may require, on remand, that the BIA take account of the depth of this political component of Acharya's police work. *Osorio*, 18 F.3d at 1029.

### C. The BIA's Orders with Respect to Acharya's Claims for Withholding of Removal and Relief Under the CAT Must Also be Remanded

We now turn to Acharya's two remaining bases for relief on appeal. With respect to withholding of removal:

> The IJ and the BIA conducted no particularized analysis as to whether [the petitioner] met the standard for withholding of removal . . . . Rather, the agency reasoned that an applicant who cannot meet the standard for asylum cannot meet the higher standard for withholding of removal. Because we are remanding this case for further consideration of . . . [the] asylum claim, . . . [the] withholding of removal claim must be reconsidered as well.

*Delgado v. Mukasey*, 508 F.3d 702, 708 (2d Cir. 2007). Because both the IJ's and BIA's decision with respect to eligibility for withholding of removal rested on an incorrect analysis of Acharya's eligibility for asylum, reconsideration of this claim is required on remand.

Finally, with respect to Acharya's claims for relief under CAT, we note that the IJ incorrectly stated that "[t]here is absolutely no evidence that government authorities would torture [Acharya]." CAR at 70-71. Thus, the IJ incorrectly

31

appears to have "required Petitioner to show the government's affirmative consent to torture." *Delgado*, 508 F.3d at 709. This is not the correct standard, as the CAT will afford protection on the basis of a showing that torture may be "inflicted by or . . . with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). The IJ's incorrect articulation of the standard "constitute[s] legal error and would by itself be grounds for remand." *Delgado,* 508 F.3d at 709. We thus recognize this legal error as grounds for remand as well.[5] In the context of this appeal, we further note that the BIA's substitution of the correct standard under the CAT also likely relied on an impermissible factual determination by the BIA. 8 C.F.R. § 1003.1(d)(3)(iv). We thus remand Acharya's CAT claim.

---

[5] While it may be possible that Acharya did not squarely present this argument in his appeal to the BIA, we do not understand the Government to argue that Acharya has failed to exhaust this claim, and thus we are not barred from considering it. *See Zhong*, 480 F.3d at 107 n.1 (2d Cir. 2007) (clarifying that we are required to decline to consider arguments on appeal if they are not exhausted below and the government does not waive its exhaustion defense, but that we may consider such arguments if the government does waive this defense).

**CONCLUSION**

The IJ in this case applied an incorrect and overly stringent legal standard in evaluating Acharya's claim of political persecution. As such, we hold the IJ committed error requiring remand. The petition for review is GRANTED, and we REMAND the matter to the BIA for further proceedings, "including proceedings before the IJ if appropriate for the development of additional facts." *Xiao Kui Lin*, 553 F.3d at 225. Finally, because we have completed our review, the currently pending motion for stay of removal before this panel is DENIED as moot.