07-1093-ag(L), 07-2829-ag(Con)
Aliyev v. Mukasey

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

––––––––

August Term, 2008

(Argued: May 28, 2008                    Decided: December 5, 2008)

Docket No. 07-1093-ag

––––––––––––––––––––

ARKIN ALIYEV, PARIDAM ARZIYEVA, AIDA ALIYEVA, ALIYAM ALIYEVA,

*Petitioners*,

– v. –

MICHAEL B. MUKASEY,[1] Attorney General of the United States,

*Respondent*.

––––––––––––––––––––

Before: KEARSE, CALABRESI, and SACK, *Circuit Judges*.

Petition for review of a decision by the Board of Immigration Appeals ("BIA") denying petitioners asylum, withholding of removal and relief under the Convention Against Torture. The BIA's order is VACATED, and the case is REMANDED to the BIA for further proceedings consistent with this opinion. The petition for review of the BIA's denial of a motion for reconsideration is DISMISSED as moot.

––––––––––––

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey has been substituted for former Attorney General Alberto R. Gonzales as the respondent in this case.

We direct the Clerk of Court to amend the official caption as noted.

BRIAN E. MEZGER, Bethesda, Md., *for Petitioners*.

REMI ADALEMO (Peter D. Keisler, Assistant Attorney General, John C. Cunningham, *on the brief*), Office of Immigration Litigation, Washington, D.C., *for Respondent*.

CALABRESI, *Circuit Judge*:

The Aliyev family—Arkin, Paridam, and two children, Aida and Aliyam[2]—are ethnic Uyghurs and citizens of Kazakhstan, seeking asylum based on the experiences of the father, Arkin Aliyev.[3] They arrived in the United States on December 27, 1998, as nonimmigrant visitors for pleasure, with authorization to remain in the United States for a temporary period not to exceed June 26, 1999. On December 29, 1998, the family left the United States and sought asylum in Canada. The Aliyevs were denied asylum in Canada, and on May 9, 2000, they were deported to the United States, where they were served with Notices to Appear, charging them with removability.[4] Seeking relief from removal, the Aliyev family filed petitions for asylum,

---

[2] A third child, Alicher Aliyev, was born in Canada on December 19, 1999.

[3] This opinion will refer to Arkin Aliyev's petition, on which his family's asylum applications rest; the family's petitions were consolidated with Arkin's by the Immigration Judge ("IJ").

[4] The Notices to Appear charged the Aliyevs with overstaying their visas, pursuant to 8 U.S.C. § 1227(a)(1)(B). Although the Aliyevs conceded removability at their master calendar hearing, they denied this specific charge, arguing that they had not overstayed their United States visa. The Immigration Judge ("IJ") amended Arkin Aliyev's Notice to Appear to reflect Aliyev's allegation that his last entry into the United States was May 9, 2000.

withholding of removal, and relief under the Convention Against Torture.

**A.  Allegations of Persecution**

Arkin Aliyev claims that, because of his Uyghur ethnic background and political opinions, he was mistreated both by Kazakh officials and by ethnic Kazakhs to whose actions the Kazakh government, in effect, granted immunity.  His allegations include the following facts and events:  In 1995, Aliyev helped to found the "Yardem" organization—an Uyghur youth group comprised of roughly 550 members.  This group, "very secretly, [was involved] in political actions such as providing refuge for Uyghur political activists fleeing from China," where Uyghurs make up a sizeable minority in Xinjiang province.  In early 1996, two of Aliyev's cousins disappeared, one of whom had been "quite active politically in the Uyghur cause."  Although the disappearance was reported to the police, "nothing was ever done," until August 1996, when an American ethnographer in Kazakhstan offered to investigate.  The ethnographer and Aliyev conducted interviews and asked people about the missing men.  Thereafter, they both were arrested by the police.  Aliyev was held overnight and beaten; he was hit several times in the face and body.

In October 1996, Aliyev was again arrested and questioned at length about his activities with the Yardem organization, his contacts with other Uyghur groups, and whether he was assisting Uyghurs fleeing China.  He was later released.  In January 1998, Aliyev, in conjunction with Yardem, placed caution signs alongside a dangerous stretch of road, and notified a local television station of the action.  During the television interview, Aliyev criticized the police and politicians for their negligence with respect to that road.  A few days later, he was attacked and badly hurt by several Kazakh men who yelled ethnic slurs at him.  In May 1998, Aliyev organized and took part in a demonstration outside the Chinese Embassy in Almaty, in order to

protest the Chinese government's treatment of Uyghurs. Aliyev was arrested, questioned, "roughed up," and released the next day. Later that month, when Yardem opened a new stadium it had built, the police attended the event and questioned the organizers, asking whether the event was political, and seeking to discover "what [the] Uyghurs [were] up to."

On October 28, 1998, four Kazakh nationalists stopped Aliyev in the street. The leader of the group, a man named Berik, whose uncle was "universally known" to be second-in-command at the Ministry of Internal Affairs, demanded Aliyev's furniture business. He told Aliyev that he wanted the business because Aliyev was a Uyghur, and Uyghurs were "not allowed to have anything." Berik told Aliyev that he "w[ould] not allow Uyghurs [to] raise their heads on [his] land," and that Uyghurs were "'living and eating up our land.'" Aliyev refused to give up his business and was attacked and beaten. Because of his injuries, Aliyev was not able to file a complaint until two days later, at which point the police sent him to the hospital for an examination and injury report, but subsequently did nothing further. On November 2, 1998, Berik contacted Aliyev and told him that he, Berik, knew that Aliyev had been to the police, and that the police would be of no help. Berik again ordered Aliyev to hand over the business and threatened Aliyev's life. Aliyev again refused to give Berik his business, but Aliyev closed the business down. On November 8, 1998, Aliyev and his wife went to a wedding, and on their return, spent the night with Aliyev's father. That night their own house was destroyed by an explosion which damaged some of the other homes in the vicinity. When Aliyev reported that his house had been destroyed, a local sheriff came over, but nothing further was ever done. After the explosion, Aliyev and his family left for the United States, and subsequently went on to Canada.

**B. Prior Proceedings**

Immigration Judge ("IJ") Hladylowycz denied Aliyev's petition for asylum, finding that (a) Aliyev was not credible, (b) Aliyev had failed to show that he had suffered past persecution, and (c) he had not demonstrated a well-founded fear of future persecution. The BIA, in a single Member decision, found, contrary to the IJ's decision, that the adverse credibility finding was not supported by the record, but nonetheless affirmed the IJ's decision. *In re Aliyev*, No. A77 733 614 (B.I.A. May 8, 2003), *aff'g* No. A77 733 614 (Immig. Ct. N.Y. City Oct. 31, 2001). Aliyev appealed the BIA's decision to the Second Circuit. While the appeal was pending, we decided *Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332, 341 (2d Cir. 2006) (holding that cumulative harassment can constitute persecution), and Aliyev and the government entered into a Stipulation and Order of Settlement to return the case to the Board for review in light of that decision.

The BIA, finding Aliyev's case "clearly distinguishable" from *Ivanishvili*, denied Aliyev asylum, again in a single Member decision dated February 21, 2007. The BIA first looked to the individual instances of alleged persecution by the Kazakh government and concluded that the August 1996 incident, during which Aliyev was beaten, was the "most serious," but was not persecution. The BIA noted that Aliyev "was only held one day and there is no indication that he sustained serious injuries or required medical attention. According to his statement, the beating was 'restrained.'" The BIA further determined that none of Aliyev's three other encounters with the police—the October 1996 arrest and questioning, the May 1998 arrest for protesting in front of the Chinese Embassy, and the May 1998 questioning at the stadium opening—constituted persecution. And the BIA concluded that even "considering the allegations of suffering and harm in the aggregate," the treatment of Aliyev did not rise to the level of persecution.

In its decision, the BIA further commented that it had previously concluded that Aliyev had failed to show that the Kazakh government was unwilling or unable to control the alleged civilian persecutors, and that nothing in the Stipulation suggested it should revisit that decision. It also discounted Aliyev's testimony with regard to Berik's actions on the ground that they were motivated by cupidity, rather than ethnic animosity. *See, e.g.*, *In re Aliyev*, No. A77 733 614, at 2 n.1 (B.I.A., Feb. 21, 2007) (stating that the January and October 1998 incidents of persecution by private actors "appear[ed]" to be "extortionist in nature"). The BIA therefore did not consider any of the incidents concerning Berik or the civilian Kazakh nationalists. In the alternative, the BIA found that Aliyev had failed to show a reasonable likelihood of future persecution. Finally, the BIA denied Aliyev withholding of removal or relief under the CAT. Aliyev both petitioned this Court for review and moved the BIA to reconsider its decision.

On June 13, 2007, the BIA denied Aliyev's motion to reconsider, again concluding that the Stipulation did not contest the BIA's prior findings concerning the non-governmental actors. The decision stated that the Board had reviewed the alleged acts of the civilian Kazakhs when it reevaluated Aliyev's claims but did not find them to be acts of persecution as contemplated by the Immigration and Nationality Act ("INA"), and therefore did not consider them in assessing the cumulative effect of multiple acts of harassment. Aliyev petitioned this Court for review of the BIA's denial of his motion to reconsider.

DISCUSSION

**A. Standard of Review**

"When the BIA issues an opinion, the opinion becomes the basis for judicial review of the decision of which the alien is complaining." *Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d

6

Cir. 2005) (quotation marks omitted). In this instance, as the BIA "did not adopt the decision of the IJ to any extent, nor is the BIA's *per curiam* opinion merely supplemental" to the IJ's decision, *id.*, we review the decision of the BIA alone. We assess the agency's factual findings under the substantial evidence standard, but review the BIA's application of legal principles to undisputed facts *de novo*. *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir. 2000). The denial of a motion to reconsider is reviewed for an abuse of discretion. *See Kaur v. BIA*, 413 F.3d 232, 233 (2d Cir. 2005) (per curiam).

**B. Analysis**

To establish eligibility for asylum, an applicant must show that he or she is a refugee who has suffered past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or has a well-founded fear of persecution on one of these grounds. *See* 8 U.S.C. § 1101(a)(42); *Islami v. Gonzales*, 412 F.3d 391, 394 (2d Cir. 2005), *overruled in part on other grounds by Shi Liang Lin v. US Dep't of Justice*, 494 F.3d 296, 305 (2d cir. 2007). While past persecution may be sufficient, on its own, to establish eligibility for asylum, asylum is discretionary relief that may be denied in certain situations. *See* 8 C.F.R. § 1208.13(b). Withholding of removal under 8 U.S.C. § 1231(b)(3) is a mandatory form of relief that requires the applicant to show that it is more likely than not that his "life or freedom would be threatened . . . on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b); *accord Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir. 2004).[5]

---

[5] Withholding of removal under the Convention Against Torture (CAT), unlike withholding under § 1231(b)(3), does not require a showing of persecution and a nexus to

We have held that asylum claims are subject to mixed-motive analysis: "The protected ground need not be the sole motive: 'the plain meaning of the phrase "persecution on account of the victim's political opinion," does not mean persecution solely on account of the victim's political opinion.'" *Uwais v. U.S. Att'y Gen.*, 478 F.3d 513, 517 (2d Cir. 2007) (quoting *Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir. 1994)). "Where there are mixed motives for a persecutor's actions, an asylum applicant need not show with absolute certainty why the events occurred, but rather, only that the harm was motivated, in part, by an actual or imputed protected ground." *Id.* at 517 (citing *Matter of S-P-*, 21 I. & N. Dec. 486, 494-95 (B.I.A. 1996)).

The BIA has defined persecution as "a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive." *Matter of Acosta*, 19 I. & N. Dec. 211, 222-23 (B.I.A. 1985), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (B.I.A. 1987). The persecution might be by the government of the country to which the alien is returnable, or "at the hands of an organization or person from which the government cannot or will not protect the alien." *Matter of McMullen*, 17 I. & N. Dec. 542, 545 (B.I.A. 1980).

It is "well established that private acts may be persecution if the government has proved unwilling to control [them]." *Pavlova v. INS*, 441 F.3d 82, 91 (2d Cir. 2006) (quoting *Ivanishvili*, 433 F.3d at 342); *see also Berishaj v. Ashcroft*, 378 F.3d 314, 323 (3d Cir. 2004) (government must be unwilling or unable to control acts); *Navas v. INS*, 217 F.3d 646, 655-56 (9th Cir. 2000) (same); *Bartesaghi-Lay v. INS*, 9 F.3d 819, 822 (10th Cir. 1993) (similar). And,

protected grounds. *See* 8 C.F.R. §§ 1208.16(c), 1208.17; *Khouzam v. Ashcroft*, 361 F.3d 161, 168 (2d Cir. 2004).

as our sister circuits have held, the link between the harm suffered by the alien and the relevant government's inaction can be shown in various ways, including "by evidence of an inability on the part of the government to prevent the acts" or "by evidence that government actors condoned the acts." *Harutyunyan v. Gonzales*, 421 F.3d 64, 68 (1st Cir. 2005); *accord Roman v. INS*, 233 F.3d 1027, 1034 (7th Cir. 2000).

Turning to Aliyev's claims, we assume the credibility of Aliyev's testimony, as the BIA explicitly rejected the IJ's adverse credibility finding. *Cf. Yan Chen*, 417 F.3d at 271. The BIA recognized that the arrest and beating of Aliyev in August 1996 was a serious incident.[6] In finding that this incident did not rise to the level of persecution, the BIA acknowledged that Aliyev was beaten, but noted that there was no indication Aliyev sustained serious injuries. We have held, however, that "a 'minor beating' or, for that matter, any physical degradation designed to cause pain, humiliation or other suffering, may rise to the level of persecution if it occurred in the context of an arrest or detention on the basis of a protected ground." *Beskovic v. Gonzales*, 467 F.3d 223, 226 (2d Cir. 2006). Although, as a result, we are inclined to consider this incident sufficient to constitute past persecution, we accept, *arguendo*, its characterization by the BIA as

---

[6] The Government argues that the use of ethnic slurs or racial epithets during an arrest or other episode of harassment does not mean the mistreatment must be on account of the victim's ethnicity. *See Lie v. Ashcroft*, 396 F.3d 530, 535-36 (3d Cir. 2005). Given our circuit's mixed-motive approach in the context of imputed political opinion, *see Vumi v. Gonzales*, 502 F.3d 150, 157-58 (2d Cir. 2007), *Uwais*, 478 F.3d at 517, we doubt that the Third Circuit's rule would have force in this circuit. We do not, however, need to reach this question, as the BIA did not dispute Aliyev's assertions that this beating was on account of his Uyghur ethnicity.

9

mere harassment and treat it as part of a conceded pattern of harassment for purposes of this opinion. (In this respect, we note that the BIA upheld the IJ's finding that "the various actions taken by the [Kazakh] government against [Aliyev] constitute discrimination and harassment." *In re Aliyev*, No. A77 733 614, at 2 (B.I.A. May 8, 2003)).

In contrast to the above-mentioned beating, the physical violence meted out by Berik and his gang could not by any stretch be described as "minor" or "restrained," and the efforts to confiscate Aliyev's business, resulting in its closure, were a "deliberate imposition of a substantial economic disadvantage." *Ivanishvili*, 433 F.3d at 341 (internal quotation marks omitted). In its February 21, 2007 decision, however, the BIA declined to take this conduct into account for two reasons: (1) it concluded that Berik's conduct "appear[ed]" to be "extortionist in nature," rather than motivated by ethnic animosity, and (2) it concluded that, in his allegations against Berik, Aliyev had failed to show that a governmental connection existed. *See In re Aliyev*, No. A77 733 614, at 2 & n.1 (B.I.A., Feb. 21, 2007). Reviewing the record in this case, we find that the BIA erred in both of these conclusions.

First, neither the BIA's February 21 order nor its order denying reconsideration suggests that the BIA applied the required mixed-motive analysis for determining whether conduct constitutes persecution. *Uwais*, 478 F.3d at 517. Like the February 21 order, the BIA's order denying reconsideration stated that the January and October 1998 incidents could not qualify as persecution because the motive was extortion. *In re Aliyev*, No. A77 733 614, at 2 (B.I.A., June 13, 2007). Yet, according to Aliyev's allegations, which given the BIA's decision we accept as credible, Berik and his gang sought to take Aliyev's business at least in part because of his

Uyghur ethnicity.[7] Aliyev testified that Berik and three other Kazakh nationalists approached him and told him that they wanted his business. Berik told Aliyev that he wanted the business because Aliyev was a Uyghur, who were "living and eating up our land." When Aliyev refused to give up his business, he was attacked and beaten badly. Plainly, this testimony was material to the motivation for Berik's treatment of Aliyev, but the BIA did not mention it and gives no indication of having considered it. The BIA's failure to conduct the required mixed-motive analysis and consider evidence supporting Aliyev's claim that Berik's actions were motivated at least in part by Aliyev's ethnicity constitutes reversible error. *Uwais*, 478 F.3d at 517; *see generally Poradisova v. Gonzales*, 420 F.3d 70, 77 (2d Cir. 2005) (explaining that we require "some indication that the IJ considered material evidence supporting a petitioner's claim").

Second, the BIA also gave no indication of having considered substantial evidence that Berik's actions were condoned by the Kazakh government. The BIA stated conclusorily in each of its three opinions that Aliyev had not shown that the government was unwilling to protect him from private persecution. The question of precisely what a person must show in order for the government to be deemed responsible for the conduct of private actors is an interesting one, as is the question of when a petitioner has shown enough so that the office of Immigration and

---

[7] We note that in the BIA's denial of Aliyev's motion for reconsideration, the agency raised for the first time the contention that Aliyev's allegations against Berik required corroborating evidence, as it was "reasonable to expect such evidence." *In re Aliyev*, No. A77 733 614, at 2 (B.I.A., June 13, 2007). The BIA did not address corroboration in its earlier, February 2007 decision. Accordingly, we do not consider this issue here, though it seems unlikely that any such corroboration could reasonably be expected.

11

Customs Enforcement, the Department of Justice, or other U.S. government entity must rebut that showing. History has demonstrated the persecutory dangers inherent in the acquiescence by government in the maltreatment inflicted by its citizens on groups disfavored by the government.[8] To ignore that reality is to ignore the equally real plight of the refugee seeking asylum.

We need not reach these questions today, however, because, in the instant case, Aliyev has clearly introduced enough evidence to forge the link between private conduct and public responsibility. Aliyev testified expressly that Berik's uncle was "universally known" to be second-in-command at the Ministry of Internal Affairs, that Berik told him that he knew Aliyev had been to the police after the October 1998 beating, and that Berik also told him that complaining to the police would do no good because of Berik's influence. Consistent with Berik's representations, when Aliyev went to the police after Berik's assault, he was referred for medical testing, but nothing further was done in terms of an investigation. Aliyev further testified that, some days after Berik assaulted him, Berik told him that if he did not turn over his business, Berik and his fellow nationalists would kill him. A few days later, an explosion destroyed Aliyev's home, while Aliyev and his family were fortuitously absent.[9] When Aliyev

_____

[8] *Cf.* MARION A. KAPLAN, BETWEEN DIGNITY AND DESPAIR (1998) (describing Jewish life in Nazi Germany throughout the 1930s and the everyday violence visited upon German Jews by private citizens acting without government reprisal). It is no accident that many of our asylum laws sprang forth as a result of events in 1930s Europe.

[9] The BIA, in its February 2007 decision, stated that the cause of the explosion of Aliyev's home was not investigated or determined, and that "[c]onsequently, neither the [IJ] nor

reported the explosion, a single local sheriff came by, but nothing further was ever done.

In *Matter of O-Z- & I-Z-*, 22 I. & N. Dec. 23 (B.I.A. 1998), the BIA found that the fact that the alien had reported at least three incidents of harassment he experienced at the hands of private actors to the police, but that the police had taken "no action beyond writing a report," was sufficient to meet the alien's burden of showing that the government was "unable or unwilling to control the [alien's] attackers." *Id.* At 26. Aliyev has also shown that despite repeated reports of violence to the police, no significant action was taken on his behalf. Moreover, the State Department Country Report lends additional plausability to Aliyev's claims of government inaction on his complaints. That report states that the Ministry of Internal Affairs "supervises the criminal police, who are poorly paid and widely believed to be corrupt."

In sum, the record in this case shows that the BIA failed to use the proper legal framework, *i.e.*, mixed-motive analysis, and likely failed to consider material evidence supporting Aliyev's claim. Aliyev's testimony, deemed credible in light of the BIA's reversal of the IJ's non-credibility finding, provides ample ground for our conclusion that the BIA was not supported by substantial evidence in its finding that Aliyev did not show that the government was unwilling to protect him from private persecution. For these reasons, we GRANT the petition for review, VACATE the BIA's order, and REMAND the case to the BIA for further proceedings consistent with this opinion. We DISMISS the petition for review of the BIA's denial of the motion for reconsideration as MOOT.

---

this Board has assumed that the . . . home was bombed by Kazak nationalists." This dismissive treatment of the bombing might, in itself, be error, but we need not reach this issue as it is clear that Berik's acts, apart from the bombing, if attributable to the state, suffice to constitute persecution.