24-115(L)
*Villalta Martinez v. Bondi*

# United States Court of Appeals

# For the Second Circuit

August Term 2024

Submitted:  June 30, 2025
Decided: July 23, 2025
Published Opinion Issued: October 8, 2025

Nos. 24-115(L), 24-1222(Con.)

JOSE SAUL VILLALTA MARTINEZ,

*Petitioner*,

*v.*

PAMELA BONDI, UNITED STATES ATTORNEY GENERAL,

*Respondent.*

On Petition for Review of an Order of the
Board of Immigration Appeals.

Before:     NEWMAN, NARDINI, AND MERRIAM, *Circuit Judges.*

Petitioner Jose Saul Villalta Martinez, a native and citizen of El Salvador, seeks review of a Board of Immigration Appeals ("BIA") decision vacating an Immigration Judge's grant of his claim for relief under the Convention Against

Torture ("CAT") and the BIA's denial of his motion to reconsider. Villalta Martinez contends that the BIA erred by (1) finding that the Immigration Judge committed clear error in granting him CAT relief and (2) failing to provide a sufficient justification for that finding.

We conclude that the BIA provided insufficient justification for its clear error finding. Accordingly, the lead petition is **GRANTED** and the case is **REMANDED** to the BIA for further consideration. The consolidated petition is **DISMISSED** as moot.

<div style="margin-left:2em">

Aaron J. Aisen, Erie County Bar Association Volunteer Lawyers Project, Inc., Batavia, NY, *for Petitioner*.

Brian M. Boynton, Principal Deputy Assistant Attorney General; Ilana J. Snyder, Senior Litigation Counsel; Timothy Bo Stanton, Senior Trial Attorney; Office of Immigration Litigation, United States Department of Justice, Washington, D.C., *for Respondent*.

</div>

PER CURIAM:

Petitioner Jose Saul Villalta Martinez, a native and citizen of El Salvador, seeks review of a January 12, 2024, decision of the Board of Immigration Appeals ("BIA") vacating a September 15, 2023, decision of an Immigration Judge ("IJ"); the IJ had granted Villalta Martinez's claim for relief from removal under the Convention Against Torture ("CAT"), Dec. 10, 1984, 1465 U.N.T.S. 85 (1984). *See*

<div align="center">2</div>

*In re Villalta Martinez*, No. A201 517 860 (B.I.A. Jan. 12, 2024), *vacating* No. A201

517 860 (Immigr. Ct. Batavia Sept. 15, 2023).  He further seeks review of the BIA's

April 12, 2024, decision denying his motion to reconsider.  *See In re Villalta*

*Martinez*, No. A201 517 860 (B.I.A. Apr. 12, 2024).

On this petition for review, Villalta Martinez contends that the BIA erred

in finding that the IJ had committed clear error in granting him CAT relief, and

that it failed to provide a sufficient justification for that finding.  We conclude

that the BIA provided insufficient justification for its clear error finding.

Accordingly, the lead petition for review is **GRANTED** and the case is

**REMANDED** to the BIA for further consideration.  The consolidated petition is

**DISMISSED** as moot.[1]

## BACKGROUND

Villalta Martinez, a native and citizen of El Salvador, entered the United

States without inspection in 2016.  *See* Cert. Admin. R. ("CAR")[2] at 201, 688.  On

---

[1] Our decision in this appeal, *Villalta Martinez v. Bondi*, No. 24-115, 2025 WL 2056109 (2d Cir. July 23, 2025), was originally issued in a summary order dated July 23, 2025.  On August 8, 2025, Petitioner moved to publish the Court's summary order.  *See* Doc. 61. By issuance of this Opinion, Petitioner's motion to publish the Court's summary order is **GRANTED**.

[2] All record citations are to the CAR in the consolidated case, No. 24-1222.

3

February 23, 2023, the Department of Homeland Security ("DHS") issued

Villalta Martinez a Notice to Appear, charging that he was subject to removal.

*See* CAR at 776-78.  On June 30, 2023, Villalta Martinez, through counsel, filed an

I-589 Application for Asylum and Withholding of Removal, including

withholding of removal under the CAT.  *See* CAR at 688-99.  Villalta Martinez

asserted in the application that he had been "violently attacked" by MS-13 gang

members in El Salvador, who continue to threaten his life, and that he also feared

persecution and torture by the Salvadoran government.  CAR at 692.

On August 23, 2023, the IJ conducted a hearing in Villalta Martinez's

removal proceeding.  *See* CAR at 168.  Villalta Martinez testified that members of

MS-13 had attacked him in February 2016, leading him to flee El Salvador: "So

they were hitting me with a machete and got me with, cut me with a machete on

the body.  They broke my fingers and then they hit me with a stick and they

broke my arm."  CAR at 196; *see also* CAR at 193.  Villalta Martinez further

testified that MS-13 members threatened to attack members of his family, and

that they continued to threaten him while he was detained in the United States.

*See* CAR at 192-201, 204-07.  In addition to the threat from MS-13 members,

Villalta Martinez testified that because of his tattoos, he would be subject to

4

arrest and torture by the Salvadoran government: "Because of what's happening in my country right now, that scares me because if I get deported they're going to arrest me thinking that I'm a gang member because of my tattoos." CAR at 206. "[T]hey're putting a lot of people in jail without them being members of a gang and that's what scared me," CAR at 205; "I think they could confuse me for a member of a gang," CAR at 208.

In addition to presenting his own testimony and documentary evidence,[3] Villalta Martinez called an expert witness, Dr. Thomas Boerman, who testified regarding the ongoing "State of Exception" in El Salvador, [4] under which "the Salvadoran government has arrested roughly 72,000 people since March 2022," in the name of combatting gangs, even though "tens of thousands of [the arrestees]

---

[3] The additional evidence included an affidavit by Dr. Lindsay Beamon-Scott attesting to Villalta Martinez's physical injuries. *See* CAR at 495-501.

[4] The "régimen de excepción" or state of exception, enacted in March 2022, is a national law of El Salvador under which known or suspected gang members are arrested and imprisoned. CAR at 505 (2022 State Dep't Report) ("Under the state of exception, which must be renewed monthly, security forces were empowered to arrest anyone suspected of belonging to a gang or providing support to gangs."); *see also* Asamblea Legislativa, *Pleno vuelve a respaldar régimen de excepción para seguir sumando días sin homicidios* (Aug. 28, 2025) https://perma.cc/M5BY-KVH2 (statement on website of the Salvadoran National Assembly announcing that the State of Exception has been extended for a forty-second time, with nearly unanimous support, and noting that more than 88,000 "terrorists" have been captured since 2022 under the government's "security operations").

have no cognizable linkages to gangs."  CAR at 646 (Boerman affidavit briefly describing the State of Exception).  Dr. Boerman testified that not only would the Salvadoran government not *protect* Villalta Martinez from MS-13, "the greatest risk to [Villalta Martinez] is from the Salvadoran government."  CAR at 252.  Dr. Boerman explained that there had been "174 documented in-custody deaths" in the first 18 months of the State of Exception, observing: "Those are deaths that are being perpetrated by officials of the state.  The state has announced that it will not even investigate those deaths[,] the majority of which show signs of torture[,] because it has suspended the constitutional protections previously afforded to prisoners."  CAR at 252-53.

On September 15, 2023, the IJ granted Villalta Martinez's petition for CAT relief.[5]  CAR at 110-17.  The IJ "accord[ed] weight to Dr. Boerman's testimony but . . . discount[ed] its probative nature given" that "he admitted in his testimony [that] he did not recall exactly what he reviewed in the case."  CAR at 112.  The IJ did not "fully discount Dr. Boerman's testimony, however, because Dr. Boerman

---

[5] The IJ denied the request for asylum as time-barred, *see* CAR at 101-03, and denied both asylum and withholding for failure to show past harm rising to the level of persecution or a nexus to a protected ground, *see* CAR at 104-110.  Villalta Martinez did not seek review of the denial of these forms of relief to the BIA and does not address them on this petition for review.

has been recognized as an expert in El Salvador country conditions" and had

"testified in detail regarding the state of exception and its application to possible

gang members." CAR at 113. The IJ further concluded that his testimony was

"in many ways verified and validated by other sources in th[e] record." CAR at

113-14. The IJ then made the following findings based on Dr. Boerman's

testimony and other evidence in the record:

> In this case the Court finds that on this record the government of El Salvador is intentionally inflicting harm and its efforts to try to qualify this as lawful sanction defeats the object and purpose of the Convention Against Torture. This Court finds that El Salvador's efforts are intentional and that it cannot be condoned merely on an argument that squalid conditions are the result of neglect, lack of resources, or insufficient access to training and education. Instead, this record supports a finding that this is a specific intent by the El Salvadoran government to cause severe pain and suffering.

CAR at 115. The IJ further found that it was

> more likely than not that the respondent if removed would be identified by El Salvadoran legal authorities as a deported gang member or suspected gang member with a criminal history. This will more likely than not result in his detention under the state of exception as Dr. Boerman provided would be required by law. This would then more likely than not provide that the respondent would be taken to an El Salvadoran prison and accorded to lengthy detention without due process as the record is clear that due process provisions have been suspended under the state of exception.

> The next more likely than not hypothetical event would be that during the course of that lengthy detention the respondent would be

7

at minimum subjected to overcrowding and unsanitary conditions that are clearly unhealthy and are purposely placed upon people subjected to the state of exception by the actions of the El Salvadoran government and more likely than not would ultimately face harm in the form of electrocution, drowning, or similar torturous behavior that warrants a finding that he would be subjected to torture.

CAR at 116-17.

DHS appealed, and on January 12, 2024, the BIA vacated the IJ's grant of CAT relief, finding: "The Immigration Judge's determination that the respondent would more likely than not be tortured is clearly erroneous." CAR at 33. The BIA concluded that Dr. Boerman's "generalized" testimony of "instances of harm" did not establish likely torture, noting that Dr. Boerman had acknowledged that he did not have "complete information" regarding conditions in Salvadoran prisons. CAR at 33. The BIA further concluded that "[t]he country conditions evidence, considered together with the expert testimony, does not establish that the respondent will likely be tortured in El Salvador." CAR at 34. In particular, the BIA held that the evidence did not demonstrate "that someone in [Villalta Martinez's] circumstances would more likely than not be tortured." CAR at 34. In sum, the BIA concluded: "[T]he evidence indicates that although prison conditions may be difficult in El Salvador, the difficult conditions [Villalta Martinez] might experience do not result from the specific intent of a public

8

official to inflict torture on him."  CAR at 34.

On January 12, 2024, Villalta Martinez timely petitioned for review by this Court.  On February 8, 2024, Villalta Martinez filed a timely motion in the BIA seeking reconsideration, arguing that the BIA had not provided justification for its finding that the IJ committed clear error.  *See* CAR at 13-18.  On April 12, 2024, the BIA denied the motion, concluding that Villalta Martinez had "not established that if detained he would more likely than not be tortured as opposed to experiencing difficult conditions generally," and that his motion to reconsider did "not address the likelihood that public officials would act with the specific intent to torture the respondent under the state of exception."  CAR at 4. After denial of the motion to reconsider, Villalta Martinez timely filed a second petition for review on May 6, 2024, and we consolidated the two petitions.

## DISCUSSION

Villalta Martinez argues on appeal that the BIA erred in finding that the IJ had committed clear error in granting him CAT relief, and that it failed to provide sufficient justification for that finding.

I.    **Standard of Review**

When, as here, the "the BIA issues an opinion" that is challenged, "we

9

review the decision of the BIA" as the agency's final decision. *Yan Chen v.*

*Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005). The BIA "will not engage in de novo

review of findings of fact determined by an [IJ]. Facts determined by the [IJ],

including findings as to the credibility of testimony, shall be reviewed only to

determine whether the findings of the [IJ] are clearly erroneous." 8 C.F.R.

§ 1003.1(d)(3)(i). Clear error review "plainly does not entitle a reviewing court

[or the BIA] to reverse the finding of the trier of fact simply because it is

convinced that it would have decided the case differently." *Wu Lin v. Lynch*, 813

F.3d 122, 127 (2d Cir. 2016) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573-

74 (1985)). Examples of clear error include when "[t]here might be no evidence

at all to support a finding of fact. Or the finding might be controverted by

indisputable evidence." *Id.* "A more likely example might arise where an IJ has

obviously misunderstood the testimony of a witness and based a finding of fact

on that misunderstanding. Situations might also arise where the evidence

opposed to the claimant's version, though not indisputable, has overwhelming

persuasive force." *Id.* "What is not in doubt, however, is that the phrase 'clear

error' is to be taken literally: the error must be clear." *Id.*

"The BIA's application of 'clear error' review is the application of a legal

10

standard to findings of fact and as such is a ruling of law" that we review *de novo*. *Id.* at 129. "However, *de novo* review does not mean that we can redetermine *de novo* whether we think the IJ has committed clear error. It means that we must determine whether the BIA has provided sufficient justification for its conclusion that the IJ has committed clear error" and "that we must make sure that the BIA has not violated the prohibition against making its own findings of fact." *Id.* The BIA must supply "cogent reasons for its rulings." *Id.* We will remand if the BIA has given "no explanation for why it rejected the IJ's reasons," has "started anew, conducting its own . . . analysis," has "engaged in impermissible factfinding," or where it has not given sufficient justification for its findings of clear error. *Id.* at 130-31 (citation and quotation marks omitted).

## II.    CAT Relief

An applicant for CAT relief has the burden to prove he will "more likely than not" be tortured "by, or at the instigation of, or with the consent or acquiescence of, a public official." 8 C.F.R. § 1208.16(c)(2); 8 C.F.R. § 1208.18(a)(1). The more likely than not standard "requires the applicant to establish that there is greater than a fifty percent chance . . . that he will be tortured." *Chun Gao v. Gonzales*, 424 F.3d 122, 128–29 (2d Cir. 2005) (citation and

11

quotation marks omitted). When determining the likelihood of future torture, the agency considers "[e]vidence of past torture inflicted upon the applicant," "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal," and "[o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3). "Barbaric prison conditions might constitute torture if they cause severe pain or suffering and if circumstances indicate that the intent of the authorities in causing the severity of pain and suffering . . . is to illicitly discriminate, punish, coerce confessions, intimidate, or the like." *Pierre v. Gonzales*, 502 F.3d 109, 121 (2d Cir. 2007).

We remand because the BIA did not provide sufficient justification for its conclusions that the IJ clearly erred in finding that Villalta Martinez would more likely than not be tortured and that there was government intent to torture. *See* CAR at 33-34; *see also Wu Lin*, 813 F.3d at 131. "On remand, the BIA will have to either accept the IJ's findings or, if it can, provide a supportable basis for rejecting them." *Wu Lin*, 813 F.3d at 131.

### A. Dr. Boerman's Testimony

The first justification the BIA gave for finding clear error in the IJ's decision is that "[t]he testimony from Dr. Boerman, considered with other evidence of

12

record, is insufficient to show that the respondent is more likely than not to be tortured if returned to El Salvador." CAR at 33. In reaching this conclusion, the BIA reasoned: "As determined by the Immigration Judge, Dr. Boerman's testimony . . . was entitled to diminished weight because [he] did not recall if he analyzed documents relevant to the respondent's particular claim, and he did not interview the respondent." CAR at 33. But the IJ did not "fully discount" Dr. Boerman's testimony, because he was qualified as an expert on El Salvador, the state of exception, and its application to possible gang members. Instead, the IJ concluded that his testimony deserved "probative weight," especially because his testimony was "in many ways verified and validated by other sources in th[e] record." CAR at 113-14. The BIA's conclusion that Dr. Boerman's testimony was entitled to diminished weight because he did not interview Villalta Martinez or recall if he had reviewed Villalta Martinez's written statements, *see* CAR at 33, does not justify finding clear error absent consideration of other country conditions evidence that corroborated Dr. Boerman's testimony.

**B.     Tattoos and Criminal Convictions**

Dr. Boerman may not have reviewed Villalta Martinez's asylum application, but he did review Form I-213, in which DHS identifies Villalta

13

Martinez's tattoos and criminal conviction. *See* CAR at 247, 646, 701-03. Dr. Boerman thus did not need to review Villalta Martinez's asylum application to determine whether he would more likely than not be subject to imprisonment under the state of exception based on his tattoos and conviction. As Villalta Martinez argues, the BIA failed to consider country conditions evidence corroborating Dr. Boerman's testimony that the tattoos alone are a basis for Villalta Martinez to be targeted under the state of exception, and that being so targeted exposed him to a likelihood of torture. *See, e.g.,* CAR at 445-57 (2022 The Intercept Report) (describing deportation and eventual disappearance in prison of a man with an MS tattoo who had been out of the gang for 15 years); CAR at 512 (2022 State Dep't Report) ("[S]ecurity forces frequently arrested persons for gang membership based solely on anonymous denunciations through a government hotline, for having tattoos, or for having any prior contact with the criminal justice system.").

The agency is required to consider the risk of torture in the aggregate. 8 C.F.R. § 1208.16(c)(3). Although the BIA considered conditions in prisons for suspected gang members under the state of exception, it did not appear to consider the risk that Villalta Martinez would be a target for police and other

14

authorities because of his visible tattoos, nor did it consider that risk in combination with country conditions evidence that his tattoos could lead to his disappearance or murder by authorities. *See* CAR at 33-35.

### C. Suspension of Due Process Rights, Including Pervasive Impunity for Extrajudicial Killings

While the BIA discounted Dr. Boerman's testimony and report, the IJ credited it because it was also supported by other evidence. *See* CAR at 33-35, 113-14. Dr. Boerman testified, in part, that the state of exception entailed a complete curtailment of due process rights, including that suspected gang members could be tortured or killed without trials. *See* CAR at 245, 266-67.

There is record support for Dr. Boerman's testimony that the state of exception has resulted in the suspension of due process rights, including that suspected gang members are killed without trial. *See* CAR at 416-17 (2022 ElSalvador.Com Report) (indicating that the Attorney General "will not prosecute police or military personnel involved in the deaths of gang members in clashes and in the line of duty"); CAR at 431 (2020 Human Rights Watch Report) ("pervasive impunity" for homicides); CAR at 435 (witnesses attesting to police moving bodies and hiding evidence); CAR at 505 (2022 State Dep't Report) ("[T]he state of exception suspended the rights to be informed immediately of

15

the reason for detention, to legal defense during initial investigations, to privacy in conversations and correspondence, and to freedom of association. . . . Significant human rights issues included . . . unlawful or arbitrary killings; forced disappearances; torture and cruel, inhuman, or degrading treatment or punishment by security forces; . . . arbitrary arrest and detention; . . . [and] arbitrary or unlawful interference with privacy. . . . [I]mpunity persisted in the security forces."); CAR at 511 ("[I]n practice, security forces were no longer required to have warrants prior to making arrests or entering homes to make arrests."); CAR at 512 (police officers were "pressured to give false testimony to incriminate detainees and to reach a daily quota of arrests," and the founder of the police union, after complaining that police were forced to make arbitrary arrests, "was arrested and held for four days on charges of 'apologizing for crime'"). Given that this evidence is relevant to the risk of torture, *see* 8 C.F.R. § 1208.16(c)(3), and the IJ credited Dr. Boerman's testimony as validated by evidence in the record, *see* CAR at 113-14, the BIA's decision to discount his testimony without considering this evidence is an insufficient justification for its clear error finding.

### D.    State-Sponsored Systematic Infliction of Torture

Dr. Boerman emphasized that, while Villalta Martinez faced a risk of harm from the gangs themselves (both within and outside the prisons), "the greatest risk to [him] is from the Salvadoran government." CAR at 252. "[T]here have been 174 documented in-custody deaths . . . [in] less than 18 months." CAR at 252-53. "[T]he majority of [these deaths] show[ed] signs of torture." CAR at 253. And there was further "documented systematic massive torture and in-custody killings." CAR at 253. According to the "former inspector general for the National Police," Salvadoran prison guards used "routine beatings" and "group electrocution" of inmates, which Dr. Boerman described as "ritualistic" for "virtually everyone" who enters the prison system. CAR at 273, 280.

Again, Dr. Boerman's testimony is supported by other evidence in the record, and the BIA's conclusion that he provided only generalized or anecdotal evidence is insufficient to support its determination that the IJ clearly erred. *See* CAR at 33-34. The record includes evidence of specific instances of torture and reports of hundreds of individuals being beaten, starved, and medically neglected. *See, e.g.*, CAR at 413-14 (2022 ElSalvador.com Article reporting 306 cases of torture, and describing the beating and simulated drowning of a 14-year old boy accused of gang membership); CAR at 455 (2022 The Intercept Report)

17

("[T]he few people released from prisons – mostly minors – have shown signs of being beaten, starved, and medically neglected," with some "show[ing] signs of torture."); CAR at 581 (2022 Amnesty Int'l Report describing the "repeated[] torture[]" of a 16-year old boy by fellow cell-mates, condoned by prison officials); CAR at 585-86 (2022 Inter Press Service Report describing a man falsely accused of gang membership who was tortured and killed in custody).

And the record also includes evidence contrary to the BIA's conclusion that such reports of torture are anecdotal. *See, e.g.*, CAR at 423-24 (2020 Human Rights Watch Report) (stating that the murder of 138 deportees from the United States, including by police and state actors, is the "tip of the iceberg"); CAR at 439 (2022 Human Rights Watch Report) ("These human rights violations include arbitrary arrests, enforced disappearances, torture and other ill-treatment of detainees, and significant due process violations. In addition, the circumstances of many deaths in custody during the state of emergency suggest state responsibility for those deaths."); CAR at 440 (stating that these "human rights violations were not isolated incidents by rogue agents. Rather, similar violations were carried out repeatedly and across the country . . . by both the military and police"); CAR at 560-61 (2022 Washington Office on Latin America Report)

("Stigmatization, persecution and repression have not been isolated actions, but are . . . carried out in a systematic manner. . . . Arbitrary detentions and torture in prisons have occurred in a systematic, generalized, and massive manner."). The BIA failed to address this evidence, and accordingly its conclusion regarding the likelihood of torture is insufficiently justified.

### E. Overcrowding and Starvation

The record also contains evidence that the government intentionally subjects detainees to overcrowding and starvation within the prisons, which (as Villalta Martinez argues) the BIA ignored. Overcrowding in one prison "rife with allegations of abuse, torture, and death" has "hit nearly 250 percent." CAR at 453 (2022 The Intercept Report). More recent reporting reflects prisons at three to six times their capacity. *See* CAR at 461 (2023 Human Rights Watch Report). The 2022 State Department Report confirms these figures and adds that "80 prisoners [were] held in cells built for 12," with "insufficient room to lie down." CAR at 509; s*ee also* CAR at 505 (detailing "credible reports of: . . . harsh and life-threatening prison conditions"). "There is extreme overcrowding in the prisons which has led to deplorable conditions. Local human rights organizations have documented a lack of basic necessities such as access to clean water, sanitary

19

services, and sufficient food in decent condition. There has also been a complete lack of medical attention for people detained who are in need of medicine for preexisting conditions." CAR at 560 (2022 Washington Office on Latin America Report).

The record also contains evidence that these conditions are intentionally inflicted, and the BIA did not address this evidence before reaching a conclusion contrary to the IJ's conclusion regarding intent. "From the start of the state of exception, the government frequently advertised on social media the overcrowded conditions and lack of adequate food in the prisons as appropriate treatment for gang members." CAR at 509 (2022 State Dep't Report). President Bukele has tweeted that "none of [the gang members] will ever get out," CAR at 358 (2022 El Pais Report), and he has ordered that prisoners "do not see sunlight," CAR at 364. He has also cut prisoner rations to two meals a day, specifically threatening: "I swear to God, [prisoners] won't eat a grain of rice, and let's see how long they last." CAR at 453 (2022 The Intercept Report); *see also* CAR at 509 (2022 State Dep't Report) ("A released prisoner reported he received four ounces of rice and one tortilla per day."). These public statements, among others, are evidence indicating a specific intent by the government to torture

20

suspected gang members. Thus, the BIA's conclusion, contrary to the IJ's, is insufficiently justified because it does not account for or address this evidence of intent.

## F. Lack of Complete Information

The BIA also justified its decision by noting that Dr. Boerman "did not have complete information regarding the prevalence of harm in Salvadoran detention facilities." CAR at 33. Dr. Boerman repeatedly emphasized that the available statistics were inherently limited given the policies of the current regime. *See, e.g.,* CAR at 267-69. And there is evidence in the record to support that assertion. President Bukele reported "zero homicides," apparently removing "the deaths of alleged gang members in confrontations with the police," from official statistics. CAR at 558 (2022 Washington Office on Latin America Report). Bukele has "dismantl[ed] . . . democratic institutions" and "has left virtually no independent government bodies that can serve as a check on the executive branch." CAR at 442 (2022 Human Rights Watch Report); *see also* CAR at 505 (2022 State Dep't Report) (detailing "credible reports" of "serious problems with the independence of the judiciary" and "serious restrictions on free expression and media, including censorship and threats to enforce criminal

21

laws to limit expression"). Bukele has "undermined transparency and accountability, including by weakening the agency in charge of ensuring access to public information." CAR at 442; *cf.* CAR at 559 (2022 Washington Office on Latin America Report) ("The members of the Institute of Access to Public Information do not fulfill their role of overseeing transparency and publicity since they are close to the ruling party."). Bukele has imposed a "gag order" on reporting on abuses in the prisons, violation of which can result in journalists being jailed for up to 15 years, and only media representatives "aligned with the administration" are allowed in prisons. CAR at 454-55 (2022 The Intercept Report); *see also* CAR at 517 (2022 State Dep't Report) (asserting that the law "effectively prohibits reporting on gang-related issues"). Again, given this evidence, the BIA did not sufficiently justify its conclusion that Dr. Boerman's lack of complete information was a basis to find clear error in the IJ's decision.

Finally, the BIA's reliance on El Salvador's Human Rights Ombudsman is unpersuasive. The Ombudsman declared that the "treatment" of detainees was not "beyond what was allowed by law," CAR at 34 (citing CAR at 509 (2022 State Dep't Report)), but the Ombudsman's "office itself was . . . denied access to the prisons to investigate . . . arrests and the conditions," CAR at 278; *accord* CAR at

22

507, 510 (2022 State Dep't Report) (stating the same, and noting that one Ombudsman was criticized as not being "an independent defender of human rights," and the next was "denied access to prisons to verify conditions"). Moreover, the "regulations do not exempt from the definition of torture those sanctions that defeat the object and purpose of the [CAT]," even if lawful under local law, such as those that are "brutal and highly disproportionate to the penological purpose for which they are imposed." *Galina v. Wilkinson*, 988 F.3d 137, 142 (2d Cir. 2021) (footnote and quotation marks omitted); *see also Pierre*, 502 F.3d at 121 ("[L]ive burial would be torture even if somewhere it were the lawful sanction for an offense.").

## CONCLUSION

In sum, we conclude that remand is warranted because the BIA gave insufficient justification for its clear error finding. The BIA's conclusion that Dr. Boerman's testimony is generalized or anecdotal fails to consider that his testimony was corroborated by various sources in the record that report intentional and systematic torture, including by beating and killing suspected gang members in and outside of prisons, and by starving prisoners and subjecting them to life-threatening prison conditions. The BIA also did not

23

grapple with evidence that the Salvadoran government has suppressed public information of its actions.

Because we are granting review of the BIA's order of removal, we dismiss as moot Villalta Martinez's consolidated petition challenging the subsequent denial of reconsideration. *See Aliyev v. Mukasey*, 549 F.3d 111, 119 (2d Cir. 2008) (granting petition for review of BIA's final order of removal and dismissing as moot petition for review of BIA's denial of reconsideration).

For the foregoing reasons, the lead petition for review is **GRANTED** and the case is **REMANDED** to the BIA for further consideration. The consolidated petition is **DISMISSED** as moot. The motion to publish this decision as an opinion is **GRANTED**. All other pending motions and applications are **DENIED** and stays **VACATED**.